## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MAINE

| | |
|---|---|
| POTITSA SCHOTT, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| KINDRED HEALTHCARE OPERATING, INC., | ) |
| KINDRED NURSING CENTERS WEST, LLC, | ) |
| and MAINE ASSISTED LIVING, LLC | ) |
| d/b/a Monarch Center, | ) |
| | ) |
| Defendants. | ) |

## COMPLAINT AND JURY TRIAL DEMAND

Plaintiff Potitsa Schott complains against Defendants Kindred Healthcare Operating, Inc., Kindred Nursing Centers West, LLC, and Maine Assisted Living, LLC, which does or has done business in the State of Maine as the Monarch Center in Saco, Maine, as follows:

## PARTIES

1.    Plaintiff Potitsa ("Pota") Schott is a resident of Biddeford, York County, Maine.  Between January 2013 and March 2015, she was employed at the Monarch Center in Saco, Maine, an assisted living memory care center.

2.    Upon information and belief, Defendant Kindred Healthcare Operating, Inc. is a Delaware corporation headquartered in Louisville, Kentucky.  Kindred Healthcare Operating, Inc. is the parent organization for Defendant Kindred Nursing Centers West, LLC.

3.     Upon information and belief, Defendant Kindred Nursing Centers West, LLC is a Delaware limited liability company headquartered in Louisville, Kentucky.  Kindred Nursing Centers West, LLC wholly owns Defendant Maine Assisted Living, LLC, which owns and operates the Monarch Center.

4.     Upon information and belief, Defendant Maine Assisted Living, LLC is a Maine limited liability company with a principal place of business in Saco, York County, Maine.

## JURISDICTION AND VENUE

5.     This action arises under the Maine Human Rights Act, 5 M.R.S. §§ 4551 et seq. ("MHRA"), the Maine Whistleblowers' Protection Act, 26 M.R.S. §§ 831 et seq. ("MWPA"), and common law Defamation. This Court has diversity jurisdiction under 28 U.S.C. § 1332.

6.     Venue is proper in the District of Maine under 28 U.S.C. § 1391(b) (2) and in Portland under Rule 3(b) of the Rules of this Court.

## JURY TRIAL DEMAND

7.     Plaintiff demands trial by jury on all issues triable to a jury.

## FACTUAL ALLEGATIONS

8.     On January 1, 2013, Ms. Schott began working at the Monarch Center, an assisted living facility in Saco, Maine.

9.     Ms. Schott was hired as the Director of Admissions.

10.    In October, 2013, she was promoted to Executive Director.

11.    The primary job duties of the Executive Director were to operate the facility efficiently and profitably, comply with Kindred and state and local policies, and ensure the highest level of care possible. The Executive Director is not responsible for clinical care of or clinical supervision of Monarch Center residents.

12.    Ms. Schott's direct supervisor was Kindred Senior Vice President Brian Newman.

13.    Kindred's Division Director of Clinical Operations at the time was Mary Yesue. Though Ms. Yesue did not supervise Ms. Schott, she was responsible for overseeing clinical operations at Monarch Center and other Kindred facilities in Maine and New England.

14.    The Director of Nursing Services ("DNS") at Monarch Center was Laura Tardif.  Ms. Tardif worked under the direction and supervision of Ms. Schott.  Ms. Tardif was also Ms. Yesue's subordinate.  Ms. Tardif was responsible for the clinical oversight of the Monarch Center facility.

**Tension Between Ms. Schott and Ms. Tardif**

15.    In September, 2014, Ms. Schott drafted a Performance Improvement Plan ("PIP") outlining a number of her concerns about Ms. Tardif's performance and attitude.

16.    For unspecified reasons, Mr. Newman prohibited Ms. Schott from issuing the PIP to Ms. Tardif.

17.     Several Monarch Center employees told Ms. Schott that Ms. Tardif approached them to join with her to complain about Ms. Schott to Kindred because Ms. Tardif opposed Ms. Schott's appointment as the Monarch Center Executive Director.

18.     In late 2014 and early 2015, Ms. Tardif told several Monarch Center employees that Ms. Schott would soon be fired.

### The March 4, 2015 Performance Improvement Plan

19.     On March 4, 2015, Brian Newman issued Ms. Schott a "final written warning PIP".

20.     Ms. Schott did not sign the PIP because she opposed any such warning absent a first, second and or third warning as required under Kindred personnel policies.

21.     Ms. Schott further opposed the imposition of a PIP because the PIP contained several false and misleading allegations.  For example, Mr. Newman falsely claimed that there were multiple (anonymous) complaints about Ms. Schott from residents' families and staff and that Ms. Schott was "targeting" Ms. Tardif.  The PIP also falsely alleged that Ms. Schott was dishonest with Kindred management about purchases of equipment or supplies that Mr. Newman had previously authorized.

### Mr. "D" – March 4, 2015 – March 9, 2015

22.     Also on March 4, 2015, the "D" family of Biddeford, Maine placed 83 year-old "Mr. D" at the Monarch Center for assisted living care.

4

23. Soon after Mr. D's admission, Monarch Center Medical Director Dr. Lisa Keiski and Ms. Tardif prescribed Zyprexa to Mr. D.

24. Shortly after he was admitted, Mr. D began experiencing serious health problems, which the family believed to be caused by his medication. Mr. D's son ("TD") grew very concerned about Mr. D's mental and physical health. TD called Ms. Tardif and the on-call nurse, Peggy Blood, several times over the weekend.

25. On Saturday March 7, 2015, Ms. Schott received a voicemail from Peggy Blood that the "D" family wanted to speak with Ms. Tardif and Ms. Schott. When Ms. Schott spoke to Ms. Tardif about this, she told Ms. Schott that she would call TD and reassure him that Mr. D's medical problems were part of the transition to the Monarch Center. Ms. Tardif also said that Ms. Blood could handle the situation and she did not feel it was necessary to go to Monarch Center.

26. On March 8, 2015, Ms. Schott Ms. Blood called Ms. Schott to report an incident in which Mr. D was acting very aggressively toward a Monarch direct care staff member that had intervened in an altercation between Mr. D and another resident. Ms. Schott immediately called Ms. Tardif to talk with her about the behaviors that Mr. D was exhibiting and to have her follow-up with the employees and the "D" family. Ms. Schott then spoke with the employee and Ms. Blood to make sure everyone was ok and to confirm with Ms. Blood that the "D" family was notified.

27.   At the morning management meeting on Monday, March 9, Ms. Schott told the other Monarch Center managers that Mr. D had a rough weekend.  Ms. Tardif reported that TD called her several times. Another employee reported to Ms. Schott that he heard Ms. Tardif say "she was not going to deal with this now" regarding Mr. D and TD.

28.   After the morning meeting, Ms. Morin, the Monarch Center Admissions Director, told Ms. Schott that TD had left a message for her and Ms. Tardif to call him back.  Ms. Schott and Ms. Morin asked Ms. Tardif to call TD with them.  Ms. Tardif refused because of TD's numerous calls over the weekend. She said she blocked TD's number.

29.   Ms. Schott pleaded with Ms. Tardif to do her job and address the situation with the "D" family.  Ms. Tardif refused.

30.   Ms. Tardif told Ms. Schott and Ms. Morin she was going home because she was not feeling well.

31.   Ms. Morin and Ms. Schott called TD, who told them he was on his way into the Monarch Center to meet with Ms. Schott and Ms. Tardif about a plan for Mr. D's care. Ms. Tardif was again asked to meet and talk with TD and Ms. Tardif again refused to meet with TD.

32.   When TD arrived at the Monarch Center, he was upset and wanted to meet with Ms. Tardif because he was very concerned about his father's well-being and medications.

33.     Ms. Schott walked into Ms. Tardif's office and pleaded with her again to meet with TD and again she refused because she said she was going home after completing the schedule.

34.     Due to Ms. Schott's previous "final warning PIP", which stated that she was not to "target" or discipline Ms. Tardif, Ms. Schott felt that she could not compel Ms. Tardif to see the "D" family or prevent her from leaving the building for fear of losing her job.

35.     Ms. Morin and Ms. Schott went to Ms. Schott's office and told TD that Ms. Tardif was not feeling well and going home, and he said that was "unacceptable."  Ms. Schott felt that she could not share with him that Ms. Tardif refused three times to speak with him.

36.     Ms. Morin and Ms. Schott told TD several times that they were not qualified or licensed to provide Mr. D. with medical or nursing care and that Ms. Tardif, along with Monarch's Medical Director, Dr. Lisa Kieski (not present), were responsible for overseeing Mr. D's medications.

37.     As the day progressed, Mr. D's family was becoming increasingly concerned. They remained in Ms. Schott's office.

38.     TD demanded that his father be seen by a doctor or nurse and stressed that he wanted his father's medications discontinued.

39.     TD asked Ms. Schott and Ms. Morin about medications and related questions that she could not answer.  Ms. Schott told him again

7

that neither Ms. Morin nor she were licensed or qualified to provide medical or nursing care.

40.     Because Ms. Tardif was ignoring her duties and because Ms. Schott reasonably believed the situation with Mr. D was a medical emergency, she felt it was necessary to contact Dr. Lisa Kieski by phone. Ms. Schott left a voice mail message with Dr. Kieski.

41.     Ms. Schott also twice called MatureCare (through which Dr. Kieski's services were provided) to speak with the Site Supervisor, who told Ms. Schott that there was no other doctor or nurse available to send to the Monarch Center to look at Mr. D.

42.     When Dr. Kieski called Ms. Schott back, she said she was in Yarmouth and could not make it to the facility.

43.     Ms. Schott told Dr. Keiski that Ms. Tardif went home sick.

44.     The "D" family was sitting directly next to Ms. Schott when she was on the phone with the doctor.  The "D" family gave a direct and adamant order for Monarch staff not to give Mr. D. the medication.

45.     Dr. Keiski was aware that the family did not want the medication. She told Ms. Schott that the medication should be withheld until she was able to see Mr. D. a couple of days later.

46.     Dr. Kieski also told Ms. Schott that if the "D" family continued to express serious concerns over Mr. D's health, they should call 911 and send him to the hospital.

8

47.     Ms. Schott informed the staff of Dr. Keiski's and the "D" family's concerns.  The family then asked Ms. Schott to arrange for an ambulance for transport Mr. D. to Maine Medical Center, which she did.

48.     Mr. D was transferred to MMC that afternoon before second shift.  The "D" family remained in Ms. Scott's office for three hours.

49.     Meanwhile, Ms. Schott was very upset with Ms. Tardif, who neglected her duties and left the facility after being asked repeatedly to see the "D" family and address their concerns.

50.     Ms. Schott immediately apprised Ms. Yesue of the situation and let her know that there was no clinical coverage in the building.  Ms. Schott told her the other nurses were not available:  one was on maternity leave and another was on vacation.

### Ms. Yesue's "Investigation" and Decision to Fire Ms. Schott

51.     On Wednesday, March 11, Dr. Keiski came to the Monarch Center.  She raised her concerns about Ms. Tardif's nursing abilities and attitude with Ms. Schott and Ms. Yesue.

52.     On March 11 and March 12, 2015, Ms. Yesue purportedly conducted an investigation into the situartion with "Mr. D".

53.     Ms. Schott told Ms. Yesue the truth, i.e., Ms. Tardif refused to talk with TD or the "D" family over the weekend, refused to talk with or see the "D" family or Mr. D. on Monday, March 9, and left work. They told

her about the call to Dr. Kieski and the directive from Dr. Kieski and the "D" family to have "Mr. D's" medications held.

54. Ms. Yesue's report states that she received an "anonymous report" that Ms. Schott "acted outside the scope of her authority".

55. Ms. Schott did not "act outside the scope of her authority". Rather, Ms. Tardif neglected and refused to perform her duties in the midst of a medical emergency.

56. Despite clear evidence of Ms. Tardif's gross negligence, Ms. Yesue's report concluded that Ms. Schott violated certain Maine regulations by "administering or discontinuing medication without a written order signed by a duly authorized licensed practitioner."

57. Further, Ms. Yesue's report alleged that Ms. Schott improperly entered notes on Mr. D's medical administration record ("MAR"). Ms. Yesue's "proof" that Ms. Schott had made the MAR entry was her opinion that the handwriting on the MAR entry appeared to be similar to Ms. Schott's handwriting.

58. When asked by Ms. Yesue, Ms. Schott truthfully stated that she did not enter MAR notes.

59. At no time did Ms. Schott make medical or nursing decisions or decisions to administer or discontinue medications.

10

60.     Ms. Schott never made entries into Mr. D's MAR.  Ms. Yesue's belief that the handwriting on the MAR matched Ms. Schott's handwriting is a false statement or gross error in judgment.

61.     Schott was discharged on March 12, 2015. The reason for her termination is stated on a PIP dated March 12, 2015.  It cites "acting outside the scope of authority" as the reason for termination.

62.     Unfortunately, Mr. D passed away on March 17, 2015, eight days after he was transported to the hospital from the Monarch Center.

**Post-Termination Statements and Actions**

63.     Defendants have made false and defamatory statements concerning Ms. Yesue's findings to one or more third parties following Ms. Schott's termination from Monarch Center.

64.     In April 2015, Brian Newman made false and misleading statements to family members of Monarch Center residents about the reasons for Ms. Schott's abrupt departure from Monarch Center, including statements that Ms. Schott "acted in a clinical manner when she was not licensed to do so", that there "was a clinician in the building who should have handled the situation", that Ms. Schott "knew there were consequences for her actions", and that her unlicensed acts "forced his hand" to fire Ms. Schott.  At or near the same time, another Kindred manager made similar statements to another family member of a Monarch Center resident about the reasons for Ms. Schott's departure.

11

65.    In May 2016, Mr. D's family initiated a medical malpractice complaint under the Maine Health Security Act.

66.    Ms. Schott has been named as a defendant in that action.

## COUNT I
### (Discrimination and Retaliation under MHRA and MWPA)

67.    Plaintiff hereby repeats, re-alleges, and incorporates by reference the foregoing paragraphs 1-66 of this Complaint.

68.    The Maine Whistleblowers' Protection Act, 26 M.R.S. § 833, ("MWPA") provides that an employer may not discharge or otherwise discriminate against an employee because

> (A) the employee, acting in good faith, reports orally or in writing to the employer…what the employee has reasonable cause to believe is a violation of a [state or federal] law or rule;
>
> (B) the employee, acting in good faith reports to the employer or a public body, orally or in writing, what the employee has reasonable cause to believe is a condition or practice that would put at risk the health or safety of that employee or any other individual; or
>
> (E) the employee, acting in good faith and consistent with state and federal privacy laws, reports to the employer, to the patient involved or to appropriate licensing, regulating or credentialing authority, what she has reasonable cause to believe is an act or omission that constitutes a deviation from the applicable standard of care for a patient by an employer charged with care of that patient.

69.    The Maine Human Rights Act, 5 M.R.S. § 4633 ("MHRA") provides that a person may not discriminate against any individual because she has "opposed any act or practice that is unlawful under this Act." It is also unlawful under the MHRA for any person to "coerce,

12

intimidate, threaten or interfere with any individual in the exercise or enjoyment of rights guaranteed or protected under this Act."

70.   As set forth above, Plaintiff engaged in activity protected by the MWPA, including but not limited to reporting to her employer what she reasonably believes to be violations of law or rules, conditions or practices that placed at risk the health and safety of others, and conditions or practices that deviated from applicable standards of care.

71.   As set forth above, Plaintiff engaged in activity protected by the Maine Human Rights Act, 5 M.R.S. § 4633 by opposing her employer.

72.   Plaintiff was subjected to adverse employment action when she was fired on March 12, 2016.  Defendants also unlawfully interfered, threatened, intimidated, and coerced her as she was participating in Ms. Yesue's investigation on March 11 and March 12, 2015.

73.   There is a causal link between such activity and action.

74.   As a direct and proximate result of Defendants' actions as set forth herein, Plaintiff suffered damages in an amount to be proven at trial.

WHEREFORE, Plaintiff prays for judgment and for the following legal and equitable relief under the MHRA and MWPA:

A.   An order for Defendant to reinstate Plaintiff to her position, or front pay in lieu of reinstatement;
B.   Back pay from March 2015, with prejudgment interest;
C.   Compensatory damages as set forth in the MHRA;
D.   Punitive damages;
E.   An award of reasonable attorney's fees and all costs; and
F.   All other damages to which plaintiff may be entitled.

13

## COUNT II
### Defamation

75.    Plaintiff hereby repeats, re-alleges, and incorporates by reference to the foregoing paragraphs 1-74 of this Complaint.

76.    As set forth above, Defendants made one or more false and defamatory statements concerning Plaintiff to one or more third-parties.

77.    Defendants' statements were intentional and malicious. In the alternative, Defendants' statements amount to at least to negligence.

78.    As a direct and proximate result of Defendants' statements, Plaintiff incurred pecuniary and non-pecuniary damages, including job loss, underemployment, harm to her reputation, and unwarranted emotional and financial distress.

WHEREFORE, Plaintiff prays for judgment against Defendants and for all damages to which she may be entitled, including, but not limited to:

A.    Future lost earnings;
B.    Back pay and benefits dating back to March 2015;
C.    Compensatory damages including, but not limited to, mental anguish, loss of dignity and other intangible injuries;
D.    Punitive damages as determined by a jury;
E.    An award of reasonable attorney's fees and costs incurred; and
F.    All other damages to which Plaintiff may be entitled

Dated:  October 5, 2016

Respectfully Submitted,
*/s/ James A. Clifford*
James A. Clifford
Andrew P. Cotter
CLIFFORD & CLIFFORD, LLC
62 Portland Rd., Suite 37
Kennebunk, ME 04101
(207) 985-3200

14