UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

POTITSA SCHOTT,                    )
                                   )
          Plaintiff,               )
                                   )
                                   )    No. 2:16-cv-00515-JAW
                                   )
KINDRED HEALTHCARE                 )
     OPERATING, INC., et al.,      )
                                   )
          Defendants.              )

**ORDER ON MOTION FOR SUMMARY JUDGMENT**

Concluding that there are genuine issues of material fact that require resolution by a factfinder, the Court denies a motion for summary judgment by a nursing center that terminated its executive director for accepting and transcribing a doctor's order to discontinue a medication for a resident and thereby violating Maine regulations, which limit those individuals who may accept a telephonic physician order to start or discontinue prescribed medicine to registered nurses and pharmacists. The plaintiff denies accepting and transcribing the physician's order, which creates a genuine issue of material fact.

The plaintiff also claims that one of the nursing center's managerial employees defamed her by falsely informing third parties that the nursing center had no choice but to terminate her because she had acted in a clinical manner without being licensed to do so. The Court also denies the defendants' motion for summary judgment on the plaintiff's defamation count, because the defamation count is premised on the truth of the manager's comment, a fact the plaintiff denies.

# I. PROCEDURAL HISTORY

On October 5, 2016, Potitsa Schott filed a complaint in this Court against Kindred Healthcare Operating, Inc., Kindred Nursing Centers West, LLC, and Maine Assisted Living, LLC, d/b/a Monarch Center,[1] alleging that the Kindred Defendants violated the Maine Human Rights Act, 5 M.R.S. §§ 4551 *et seq.* (MHRA) and the Maine Whistleblowers' Protection Act, 26 M.R.S. §§ 831 *et seq.* (MWPA) and defamed her under common law. *Compl.* (ECF No. 1). The Kindred Defendants filed an answer on December 5, 2016, denying the essential allegations of the Complaint. *Answer to Compl.* (ECF No. 4).

On September 28, 2017, after the completion of discovery, the Kindred Defendants filed a motion for summary judgment, a stipulation of facts, and a statement of uncontested material facts. *Defs.' Mot. for Summ. J.* (ECF No. 38) (*Defs.' Mot.*); *Stip. Statement of Material Facts* (ECF No. 39) (*Stip.*); *Defs.' Statement of Material Facts* (ECF No. 40) (DSMF). On October 23, 2017, Ms. Schott filed a response, opposing the motion, together with an opposing statement of material facts and a statement of material facts. *Pl.'s Opposition to Defs.' Mot. for Summ. J.* (ECF No. 45) (*Pl.'s Opp'n*); *Pl.'s Opposing Statement of Material Fact and Statement of Additional Material Facts* (ECF No. 46) (PRDSMF; PSAMF). On October 30, 2017, the Kindred Defendants filed their reply and a response to the Plaintiff's statement of facts. *Defs.' Reply in Support of Mot. for Summ. J.* (ECF No. 50) (*Defs.' Reply*); *Defs.' Reply to Pl.'s Statement of Additional Material Facts* (ECF No. 51) (DRPSAMF).

---

[1] The Court refers to the Defendants collectively as the Kindred Defendants, unless the context requires otherwise.

On November 2, 2017, Ms. Schott filed a sur-reply in opposition to the Kindred Defendants' motion for summary judgment.[2] *Pl.'s Sur-Reply in Opp'n to Defs.' Mot. for Summ. J.* (ECF No. 56) (*Pl.'s Sur-Reply*). The Kindred Defendants filed a response to the Plaintiff's sur-reply on November 13, 2017.

On October 31, 2017, the Kindred Defendants moved for oral argument on the motion for summary judgment. *Req. for Oral Argument on Defs.' Mot. for Summ. J.* (ECF No. 52). On November 20, 2017, the Court granted the request, *Order Granting Req. for Oral Argument/Hr'g*, and held oral argument on July 17, 2018.

At oral argument, the Court invited the parties to file memoranda by July 20, 2018, regarding the Kindred Defendants' assertion that Ms. Schott is bound by the contents of her first sworn declaration to the Maine Human Rights Commission and may not rely on subsequent sworn declarations that differently describe the same events. Ms. Schott and the Kindred Defendants filed supplemental memoranda on July 20, 2018. *Pl.'s Suppl. Br. in Opp'n to Defs.' Mot. for Summ. J.* (ECF No. 61) (*Pl.'s Suppl. Br.*); *Defs.' Suppl. Mem. on Whether Pl. May Contradict Her Own Prior Sworn Statement to Create a Genuine Issue of Material Fact* (ECF No. 62) (*Defs.' Suppl. Br.*).

## II.    STATEMENT OF FACTS[3]

---

[2]      On November 1, 2017, Ms. Schott moved for leave to file a sur-reply. *Pl.'s Mot. for Leave to File Sur-Reply* (ECF No. 53). The Court granted the motion on November 2, 2017 but gave the Defendants ten days within which to respond to the sur-reply. *Order Granting Mot. for Leave to File Sur-Reply* (ECF No. 56).
[3]      In accordance with "conventional summary judgment praxis," the Court recounts the facts in the light most favorable to Ms. Schott's theory of the case consistent with record support. *Gillen v. Fallon Ambulance Serv., Inc.*, 283 F.3d 11, 17 (1st Cir. 2002). In compliance with this obligation, the Court recites certain events as facts even though the Kindred Defendants dispute them.

## A.    The Parties and Others[4]

Potitsa Schott is a resident of Biddeford, York County, state of Maine. *Compl.* ¶ 1; *Answer* ¶ 1.   Kindred Healthcare Operating, Inc. is a Delaware corporation headquartered in Louisville, Kentucky and the parent organization for Kindred Nursing Centers West, LLC. *Compl.* ¶ 2; *Answer* ¶ 2.  Defendant Nursing Centers West, LLC is a Delaware limited liability company headquartered in Louisville, Kentucky and wholly owns Maine Assisted Living, LLC, which owns and operates the Monarch Center. *Compl.* ¶ 3; *Answer* ¶ 3.  Maine Assisted Living, LLC is a Maine limited liability company with a principal place of business in Saco, York County, Maine. *Compl.* ¶ 4; *Answer* ¶ 4.  Monarch Center is now called Kindred Living at Monarch. *Stip.* ¶ 1.

## B.    Potitsa Schott: Job Duties as Executive Director

Potitsa Schott worked at the Monarch Center, the Kindred Defendants' assisted living facility in Saco, Maine for approximately two and a half years, first as the Admissions Coordinator and then, beginning in October 2013, as the Executive Director. *Stip.* ¶ 1.  Ms. Schott's primary job duties as Executive Director were to

---

[4]    The parties did not identify themselves in the statements of material fact and to provide context, the Court referred to the allegations in the Complaint and contents of the Answer to provide some background information about the Plaintiff and the Kindred Defendants.  In their Answer, the Kindred Defendants admitted paragraphs one through three of the Plaintiff's allegations about herself, Kindred Healthcare Operating, Inc., and Kindred Nursing Centers West, LLC, including the allegation that Kindred Nursing operates Maine Assisted Living, LLC.  However, the Kindred Defendants denied the allegation that Maine Assisted Living is a limited liability company with a principal place of business in Saco, Maine.  The Court is unclear why the Kindred Defendants denied that allegation, but Maine Assisted Living's exact status is not material to the resolution of the issues in the motion for summary judgment and, in accordance with its obligation to view contested facts in the light most favorable to the Plaintiff, the Court viewed the allegation in paragraph four of the Complaint as true for purposes of ruling on the motion for summary judgment.

operate the facility efficiently and profitably, and comply with Kindred and state policies. PSAMF ¶ 1; DRPSAMF ¶ 1. As Executive Director of the Monarch Center, Ms. Schott was responsible for the overall operation of the Monarch Center.[5] DSMF ¶ 1; PRDSMF ¶ 1. Ms. Schott supervised all employees in the Monarch Center and reported issues at the facility, including clinical, human resources, and performance issues, to one or more regional Kindred employees, Vice President of Assisted Living Brian Newman, District Director of Clinical Operations Mary Yesue, and/or District Director of Human Resources Gregg Hanscom.[6] DSMF ¶ 2; PRDSMF ¶ 2. Ms.

[5]     The Kindred Defendants' paragraph one states that Ms. Schott as Executive Director was "ultimately responsible for the overall operation of the Monarch Center in compliance with all applicable state regulations." DSMF ¶ 1. Ms. Schott admitted the statement, except as to clinical issues, which she said were the responsibility of Mary Yesue and Laura Tardif. PRDSMF ¶ 1. Ms. Schott affirmatively asserted that the Executive Director is "not responsible for clinical care of or clinical supervision of Monarch Center residents," an assertion the Kindred Defendants deny. PSAMF ¶ 2; DRPSAMF ¶ 2.
        The exact scope of Ms. Schott's responsibilities as Executive Director for clinical matters is a difficult question in the context of this motion. In support of her qualified response, Ms. Schott cites Ms. Yesue's deposition in which Ms. Yesue states that she "was responsible for regulatory compliance" in the centers she was assigned to. PRDSMF ¶ 1 (citing *Dep. of Mary Yesue* 9:2-4 (ECF No. 42)). But as the Kindred Defendants elsewhere point out, the fact that Ms. Yesue was responsible for regulatory compliance as district director does not mean that Ms. Schott had no responsibility for clinical compliance. *See* DRPSAMF ¶ 2. Ms. Schott also cites Ms. Tardif's and her own job descriptions. PRDSMF ¶ 1. Ms. Tardif's job description states that she is "responsible for oversight of the daily clinical and administrative operations of the nursing department." *Id.* Attach. 2, *Job Description, Director of Nursing* at 1. It also says that she reports to the Executive Director. *Id.* Ms. Schott's job description states that she was "[r]esponsible for the efficient and profitable operation of the facility, facility compliance with Kindred policies and States and Federal rules and regulations, and providing the highest quality of care possible." *Id.* Attach. 3, *Job Description, Executive Director* at 1. None of Ms. Schott's citations says that the Executive Director is not responsible at all for clinical compliance. The Court accepts Ms. Schott's contention that her ability to supervise clinical functions was constrained because she was not a clinician, that she had limited authority to supervise Ms. Tardif, who was a clinician, and that Ms. Yesue made it difficult for her to manage the facility, especially in her oversight of Ms. Tardif. But the Court does not accept her contention that she had no responsibility whatsoever over clinical matters. Ms. Schott's citations do not support her broad denial of any responsibility.
[6]     The Kindred Defendants' paragraph two states that Ms. Schott supervised all employees in the Monarch Center. DSMF ¶ 2. Ms. Schott admitted paragraph two, except for her ability to report clinical issues to Kindred employees, and she affirmatively stated that she was not responsible for reporting issues of clinical compliance or emergency matters. PRDSMF ¶ 2. She also affirmatively stated that her ability to supervise and/or discipline Ms. Tardiff was severely limited and that she was prohibited from issuing her a performance improvement plan in 2014. *Id.* Ms. Schott also

Schott's direct supervisor was Regional Vice President of Assisted Living Brian Newman. PSAMF ¶ 3; DRPSAMF ¶ 3. Ms. Schott is not a licensed or registered nurse. *Stip.* ¶ 3.

During the time, Ms. Schott worked as Executive Director, Laura Tardif (now Walton) was the Director of Nursing Services (DNS) at the Monarch Center and reported to Ms. Schott. *Stip.* ¶ 2. Ms. Tardif was responsible for clinical oversight of the facility. PSAMF ¶ 4; DRPSAMF ¶ 4. Although Ms. Tardif denied that the Director of Nursing job description accurately summarized her duties at the Monarch Center, she was unable to articulate how the job description did not apply to her.[7] PSAMF ¶ 5; DRPSAMF ¶ 5. Among other duties, the Director of Nursing is responsible for:

> [O]versight of the daily clinical and administrative operations of the nursing department to assure that each resident receives the necessary care and services to attain or maintain the highest practicable physical, mental and psychosocial well being. . . . [A]dvocate for the residents and staff under his/her direction; Remains knowledgeable about the residents and their conditions through mechanisms such as making daily rounds and discussion with charge nurse and promotes person-centered care; Promotes and evaluates residents and family satisfaction with nursing services; Advocates for and assists with smooth transitions of care from one setting to another through effective communication and discharge planning activities; Promotes an environment where residents' rights are protected and residents are free from abuse and neglect; and Communicates effectively, actively listens and functions effectively as part of the team.

---

affirmatively states that Ms. Yesue interfered with her ability to manage the facility, especially with regard to Ms. Tardif. *Id.* In accordance with its obligation to view contested facts in the light most favorable to the Plaintiff, the Court included Ms. Schott's affirmative assertions in a subsequent sentence.

[7] The Kindred Defendants denied Ms. Schott's paragraph five. DRPSAMF ¶ 5. The Court overrules the denial, except insofar as it denies that the job description came from Ms. Tardif's personnel file. *Id.* The Court reviewed the cited testimony and found no confirmation that the job description came from Ms. Tardif's personnel file and it has not included this portion of Ms. Schott's paragraph five in its recitation of the facts.

PSAMF ¶ 6; DRPSAMF ¶ 6. Among relevant qualifications for the Director of Nursing position are: certification as a director of nursing or nursing executive/administrator in long term care preferred and a valid RN license in the state employed.[8] PSAMF ¶ 7; DRPSAMF ¶ 7. Ms. Tardif did not hold a certification as a director of nursing executive/administrator and did not have a RN license. PSAMF ¶ 7; DRSAMF ¶ 7.

In September 2014, Ms. Schott drafted a Performance Improvement Plan (PIP) outlining a number of her concerns about Ms. Tardif's performance and attitude. PSAMF ¶ 8; DRPSAMF ¶ 8. Ms. Schott's ability to supervise or discipline Ms. Tardif was severely limited, and Mr. Newman prohibited Ms. Schott from issuing Ms. Tardif a PIP in 2014.[9] PRDSMF ¶ 2; PSAMF ¶ 9; DRPSAMF ¶ 9. Also, Ms. Yesue interfered with Ms. Schott's ability to manage the facility, especially with regard to Ms. Tardif. *Id.* Several employees told Ms. Schott that Ms. Tardif approached them to join with her to complain about Ms. Schott because Ms. Tardif opposed Ms. Schott's appointment as the Executive Director.[10] PSAMF ¶ 10; DRPSAMF ¶ 10. In 2014

---

[8]    The Kindred Defendants interposed a qualified response to Ms. Schott's paragraph seven on the ground that the quoted job description applies to long-term skilled settings, not assisted living facilities and that Maine regulations allow an LPN to serve as a director of nursing at an assisted living facility. DRPSAMF ¶ 7. The Kindred Defendants admitted Ms. Tardif's lack of an RN license and certification as a director of nursing executive/administrator. *Id.* The Court included Ms. Schott's paragraph seven with some hesitation, but it ultimately concluded that the Kindred Defendants' qualified response was based on a factual disagreement, which must be viewed in the light most favorable to Ms. Schott.

[9]    The Kindred Defendants interposed a qualified response, indicating why Mr. Newman prevented Ms. Schott from issuing Ms. Tardif a PIP; however, Ms. Schott's paragraph nine does not assert why Mr. Newman made this decision, only that he made it. *See* PSAMF ¶ 9. The Court declines to include additional facts not directly responsive to Ms. Schott's statement and found only in the Kindred Defendants' response to Ms. Schott's statement of material facts.

[10]    The Kindred Defendants objected to this paragraph on hearsay grounds. DRPSAMF ¶ 10. The Court overrules the evidentiary objection. If Ms. Tardif were called as a witness at trial, she would

7

and early 2015, Ms. Tardif told several Monarch Center employees that Ms. Schott would soon be fired.[11]  PSAMF ¶ 11; DRPSAMF ¶ 11.

### C.    The March 4, 2015 Performance Improvement Plan

On March 4, 2015, Brian Newman and Gregg Hanscom issued Ms. Schott a "final written warning PIP [performance improvement plan]."  PSAMF ¶ 12; DRSAMF ¶ 12.  Ms. Schott did not sign the PIP because she opposed any such warning absent a first, second, and/or third warning as required under Kindred personnel policies and because the PIP contained several false and misleading allegations.[12]  PSAMF ¶ 13; DRPSAMF ¶ 13.  At his deposition, Mr. Newman was unable to explain how any of the issues that he labeled "dishonest" in the March 3, 2015 PIP actually constituted "dishonesty."[13]  PSAMF ¶ 14; DRPSAMF ¶ 14.  Mr. Newman was unable to explain what gave rise to, or triggered, the issuing the March 4, 2015 PIP to Ms. Schott.[14]  PSAMF ¶ 15; DRPSAMF ¶ 15.

### D.    Potitsa Schott's Reports to Management About Laura Tardif

---

[11]    either admit the contents of paragraph ten or, if she denied the contents, the contents would be admissible to impeach Ms. Tardif.

[11]    The Kindred Defendants objected to this paragraph again on hearsay grounds.  DRPSAMF ¶ 11.  The Court included paragraph eleven for the same reasons described in the preceding footnote.

[12]    The Kindred Defendants interposed a qualified response, indicating that Ms. Schott's own statement is insufficient to prove the contents of the Kindred progressive discipline policy.  DRPSAMF ¶ 13.  The Court overrules the Kindred Defendants' objection.  The statement reflects not what the Kindred Defendants' policy actually was, but what Ms. Schott believed it to be, and offers an explanation for why she did not sign the PIP.

[13]    The Kindred Defendants denied Ms. Schott's paragraph fourteen, stating that Mr. Newman had explained at his deposition that Ms. Schott was dishonest in her statement about dangerous conditions at the Monarch Center, referring specifically to ice on the roof.  DRPSAMF ¶ 14.  The Court views this disagreement as factual and is required to view disputes about the facts in the light most favorable to Ms. Schott.  The Court included Ms. Schott's paragraph fourteen.

[14]    The Kindred Defendants interposed a qualified response to Ms. Schott's paragraph fifteen, pointing out that Mr. Newman testified that he could not recall the specifics about what triggered his sitting down with Ms. Schott on March 4, 2015 but that he knew he would have had a conversation with HR before doing so.  DRPSAMF ¶ 15.  The Court overrules the Kindred Defendants' qualified response as non-responsive to Ms. Schott's paragraph fifteen.

During the meeting with Mr. Newman and Mr. Hanscom, and separately with Ms. Yesue, Ms. Schott reported two specific concerns about Ms. Tardif's professional incompetence and actions that jeopardized the health and safety of Monarch Center residents.[15]  PSAMF ¶ 16; DRPSAMF ¶ 16.

Ms. Schott reported that on March 3, 2015, Ms. Tardif failed to order medication and ensure that a resident was given medication before the resident's oral surgery appointment.[16]  PSAMF ¶ 17; DRPSAMF ¶ 17.  Ms. Schott also reported that Ms. Tardif said she was going to be at the Monarch Center's sister facility in Cape Elizabeth and that she would return; however when she did not return, Ms. Schott called the sister facility and was told that Ms. Tardif had left a long time ago.  *Id.* Ms. Schott called Ms. Tardif who said she would not be back that day.  *Id.*  Peggy Blood had to scramble later that night to make sure the resident received his medication in time to have his surgery performed.  *Id.*  Ms. Schott made this report on March 4, 2015 because of her concern for the safety and comfort of the resident, the doctor, and the doctor's employees.  *Id.*

---

[15]     The Kindred Defendants interposed a lengthy qualified response.  DRPSAMF ¶ 16.  They say that Ms. Schott's contention that she reported conduct by Ms. Tardif that jeopardized the health and safety of residents of the Monarch Center is not supported by the record.  *Id.*  The Court views the Kindred Defendants' responses as factual disputes and the Court is required to view factual disputes in the light most favorable to Ms. Schott.  The Court included Ms. Schott's paragraph sixteen.

[16]     The Kindred Defendants interposed a qualified response.  DRPSAMF ¶ 17.  As with the qualified response in paragraph sixteen, the Court views this matter as a factual dispute and is required to view disputed facts in the light most favorable to Ms. Schott.  The Court included Ms. Schott's paragraph seventeen.

Ms. Schott also reported an instance occurring in February 2015 when Ms. Tardif lied to a family member about a resident not receiving her cancer medication at the Monarch Center.[17] PSAMF ¶ 18; DRPSAMF ¶ 18.

Ms. Schott also reported that she had contacted Dr. Keiski and the family member to discuss Ms. Tardif's dishonesty.[18] PSAMF ¶ 23; DRPSAMF ¶ 23.

As to both issues, Mr. Newman and Mr. Hanscom said that they "didn't want to hear anything about it."[19] PSAMF ¶ 18; DRPSAMF ¶ 18.

### E. Monarch Center Resident PD and the Weekend of March 7-8, 2015

On March 4, 2015, the D family placed their father, PD or Mr. D, at the Monarch Center for assisted living care and PD was admitted to the Monarch Center. PSAMF ¶ 20; DRPSAMF ¶ 20; *Stip.* ¶ 4. Over the weekend of March 7-8, 2015, PD exhibited challenging behavior, including physical altercations with staff and another resident. *Stip.* ¶ 5. Mr. D had serious health problems and displayed aggressive and

---

[17] The Kindred Defendants interposed a qualified response, disputing the characterization of the report. DRPSAMF ¶ 18. As with the qualified responses in paragraphs sixteen and seventeen, the Court views this matter as a factual dispute and is required to view disputed facts in the light most favorable to Ms. Schott. The Court included Ms. Schott's paragraph eighteen.

[18] The Kindred Defendants deny Ms. Schott's paragraph twenty-three, asserting first that the record citations do not support the assertions in the paragraph. DRPSAMF ¶ 23. The Court overrules that qualification. The Kindred Defendants also assert that Dr. Keiski is not a Kindred employee. The Court observes that this objection misses the point about a retaliation claim. If the employee threatens and does embarrass the employer by reporting misconduct to individuals, agencies, or institutions other than the employer's own employees, the employer has all the more reason to retaliate against the whistleblowing employee. The Court overrules the denial.

[19] The Kindred Defendants interposed a qualified response, stating that Mr. Newman and Mr. Hanscom made this response only to the second claim, not both. DRPSAMF ¶ 19. As with the qualified responses in paragraphs sixteen through eighteen, the Court views this matter as a factual dispute and is required to view disputed facts in the light most favorable to Ms. Schott. The Court included Ms. Schott's paragraph nineteen.

violent behavior.[20]  PSAMF ¶ 21; DRPSAMF ¶ 21.   Soon after Mr. D's admission, in collaboration with Ms. Tardif, Monarch Center Medical Director Dr. Lisa Keiski prescribed Zyprexa to Mr. D.[21]  *Id.*  Ms. Schott asked RN Peggy Blood, who was on call that weekend, to go into the facility to evaluate PD.  *Stip.* ¶ 6.

Over that weekend, Ms. Schott discussed PD's challenging behavior with Ms. Tardif and asked her to call PD's family.  DSMF ¶ 3; PRDSMF ¶ 3.  Specifically, on March 7, 2015, Ms. Schott received a voicemail from the on-call nurse Peggy Blood that Mr. D's family wanted to speak with Ms. Tardif about their concerns regarding Mr. D's medication and his highly erratic behavior.  PSAMF ¶ 24; DRPSAMF ¶ 24.  Ms. Schott called Ms. Tardif several times and asked her to address the family's concerns and look into the medication issue.[22]  *Id.*  On March 8, 2015, the weekend on-call nurse called Ms. Schott to report an incident in which Mr. D. was acting very

---

[20]     The Kindred Defendants interposed a qualified response, stating that they reject any suggestion that the Zyprexa caused Mr. D to become aggressive and violent, since he had exhibited these issues before admission.  DRPSAMF ¶ 21.  The Court does not interpret Plaintiff's paragraph twenty-one as asserting that Mr. D's aggressive and violent behavior was caused by Zyprexa.

[21]     Ms. Schott's paragraph 21 states that Dr. Keiski and Ms. Tardif prescribed Zyprexa to Mr. D. PSAMF ¶ 21.  The Kindred Defendants deny that Nurse Tardif prescribed Zyprexa.  DRPSAMF ¶ 21. In support of her assertion that Nurse Tardif prescribed Zyprexa, Ms. Schott cites her own affidavit. PSAMF ¶ 21 (citing Attach. 4, *Decl. of Potitsa Schott* ¶ 4).  She also cites Nurse Tardif's deposition. *Id. Tardif Dep.* 94:23-95:18).  The Court does not accept Ms. Schott's assertion that Nurse Tardif actually prescribed Zyprexa.  What Nurse Tardif stated was that she discussed Mr. D's symptoms with Dr. Kieski while Mr. D's son was present and that "everyone was in agreeance that we needed to have some medication that would help with some of those behaviors."  *Tardif Dep.* 95:19-24.  Thus, as with nurses generally, Nurse Tardif stated that she "collaborated" with Dr. Kieski in the decision to prescribe medication, but there is no evidence that Nurse Tardif actually prescribed Zyprexa.  The Court amended the paragraph.

[22]     The Kindred Defendants interposed a qualified response to Ms. Schott's paragraph twenty-four, stating that the record citation does not support the assertion that Ms. Schott asked Ms. Tardif to look into the medication issue.  DRPSAMF ¶ 24.  Otherwise the Kindred Defendants admit the contents of paragraph twenty-four.  The Court overrules the Kindred Defendants' qualification.  In the cited deposition, it is clear that Ms. Schott called Ms. Tardif to discuss the family's concerns, which were focused on the medication issue.  *Schott Dep.* at 117:19-21 ("[T]he family was - - was over and over and over again saying that they didn't want him to receive the medication").

aggressively toward a staff member and another resident. PSAMF ¶ 25; DRPSAMF ¶ 25. Ms. Schott spoke with Ms. Tardif about the behavior that Mr. D. was exhibiting and again asked her to follow-up with the employees and Mr. D's family. *Id.* PD was not transferred to a hospital over the weekend. *Stip.* ¶ 7. Ms. Schott understood that a hospital transfer was one of several options during an emergency.[23] DSMF ¶ 4; PRDSMF ¶ 4.

### F.    March 9, 2015: Laura Tardif Become Ill and Goes Home

At the morning management meeting on Monday, March 9, 2015, Ms. Schott told the staff, including Ms. Tardif, that Mr. D had a rough weekend and that his son and family were very concerned about their father's health and safety. PSAMF ¶ 26; DRPSAMF ¶ 26. At the same morning management meeting on Monday, March 9, 2015, at which both Ms. Schott and Ms. Tardif were present, Ms. Tardif reported that she was sick. DSMF ¶ 5; PRDSMF ¶ 5; *Stip.* ¶ 8. Mr. D's son expressed concerns to Ms. Schott about his father's health and asked that his father be seen by a nurse or doctor. *Stip.* ¶ 9. One of the family's concerns related to Zyprexa, the medicine that Mr. D had been prescribed. *Stip.* ¶ 10.

Ms. Tardif informed Ms. Schott that she was going home due to her illness.[24] DSMF ¶ 6; PRDSMF ¶ 6. Ms. Schott objected to Ms. Tardif's going home sick and

---

[23]    The Kindred Defendants' paragraph four stated that "Plaintiff understood that the proper procedure at the Monarch Center in a medical emergency was to transfer the patient to a hospital." DSMF ¶ 4. Ms. Schott denied this statement, asserting that a hospital transfer was one of several options. PRDSMF ¶ 4. The Court amended the Kindred Defendants' statement to reflect Ms. Schott's qualified response.

[24]    Ms. Schott interposed a qualified response to this paragraph, stating that Ms. Tardif made this statement when she and Jessie Morin had gone to Ms. Tardif's office to ask her to call Mr. D's son, that Ms. Tardif told them that she "was not going to deal with this now," that she was not coming out because she was sick and was going home, and that she blocked Mr. D's son's phone number. PRDSMF

12

tried to get her to speak with PD's son, who was present at Monarch Center, regardless of whether she was sick.[25] DSMF ¶ 7; PRDSMF ¶ 7. Ms. Tardif said "she was not going to deal with this now."[26] PSAMF ¶ 27; DRPSAMF ¶ 27. Ms. Schott and Monarch Admissions Director Jessie Morin asked Ms. Tardif several times to call Mr. D's son. *Id.* Ms. Tardif refused and said she "blocked" Mr. D's son's number; Ms. Schott pleaded with her in person and by phone to address the situation.[27] *Id.* Ms. Tardif again refused and said she was going home because she was sick. *Id.* Ms. Schott expressed serious concern that they needed to do something to help Mr. D, but Ms. Tardif on no fewer than three occasions refused to speak to Mr. D's family. *Id.* Ms. Tardif thought she was "very sick" with strep throat and she went home without speaking to Mr. D's son.[28] DSMF ¶ 8; PRDSMF ¶ 8. During the morning of March 9, 2015, Ms. Tardif informed Ms. Yesue and Mr. Newman by email that she was ill with strep throat and Ms. Yesue instructed her to go home. DSMF ¶ 9; PRDSMF ¶ 9.

---

¶ 6. As none of these additional facts contradict the Kindred Defendants' paragraph six, the Court has not included it.

[25] Ms. Schott interposed a qualified response noting that she has not yet formed an opinion as to whether Ms. Tardif was actually sick. PRDSMF ¶ 7. Ms. Schott's own opinion as to whether Ms. Tardif was actually sick is not relevant to the question of whether Ms. Tardif was in fact sick. The Court included the Kindred Defendants' paragraph as proposed.

[26] The Kindred Defendants denied this statement on the ground that Ms. Tardif denied it. DRPSAMF ¶ 27. This is not a valid basis for a denial since, as the Kindred Defendants know, the Court must view the evidence in the light most favorable to Ms. Schott. Ms. Schott's statement is based on her own personal knowledge. The Court declines to accept the Kindred Defendants' denial.

[27] The Kindred Defendants denied this statement on the ground that Ms. Tardif denied it. DRPSAMF ¶ 27. This is not a valid basis for a denial since, as the Kindred Defendants know, the Court must view the evidence in the light most favorable to Ms. Schott. Ms. Schott's statement is based on her own personal knowledge. The Court declines to accept the Kindred Defendants' denial.

[28] Ms. Schott interposed a qualified response noting that she did not know whether Ms. Tardif was actually sick and noting that Ms. Tardif said she had strep throat and the flu. PRDSMF ¶ 8. Whether Ms. Schott is now convinced that Ms. Tardif was actually sick is not the issue. However, absent any proof that Ms. Tardif was in fact sick, the Court amended the paragraph to reflect that Ms. Tardif thought she was sick.

### G. March 9, 2015: Potitsa Schott and Mr. D

About an hour after Mr. D's son arrived at the Monarch Center on the morning of March 9, 2015, Ms. Schott visited Mr. D's room. DSMF ¶ 10; PRDSMF ¶ 10. During her visit to Mr. D's room, Ms. Schott considered Mr. D to be in danger and believed the situation was an emergency. DSMF ¶ 11; PRDSMF ¶ 11. After visiting with Mr. D, Ms. Schott did not immediately set in motion the process to have Mr. D transferred to the hospital.[29] DSMF ¶ 12; PRDSMF ¶ 12. Having already tried to get Ms. Tardif to see Mr. D, Ms. Schott left a message for Dr. Keiski, a contracting physician who visited the Monarch Center once every two weeks, every other Wednesday.[30] DSMF ¶ 13; PRDSMF ¶ 13. Ms. Schott felt it was necessary to contact Dr. Keiski, who told Ms. Schott she was in Yarmouth and could not make it to Monarch. PSAMF ¶ 28; DRPSAMF ¶ 28; DSMF ¶ 14; PRDSMF ¶ 14.

After leaving a message for Dr. Keiski, Ms. Schott also called Kindred District Director of Clinical Operations Mary Yesue to inform her that Ms. Tardif had gone home for the day and to discuss options for clinical coverage. DSMF ¶ 15; PRDSMF ¶ 15. Ms. Yesue was not concerned about Ms. Tardif's departure because she knew

---

[29] Ms. Schott interposed a qualified response, explaining that Mr. D's family wanted him seen by a clinician at Monarch and that she tried to find a clinician to see Mr. D. there. PRDSMF ¶ 12. The Court has not included Ms. Schott's qualifications because they are non-responsive to the content of the Kindred Defendants' paragraph twelve. Furthermore, by making these assertions in her response and not including them in her additional facts, Ms. Schott deprived the Kindred Defendants of a response.

[30] The Kindred Defendants' paragraph thirteen stated that the first thing Ms. Schott did after seeing Mr. D was attempt to contact Dr. Keiski. DSMF ¶ 13. Ms. Schott interposed a qualified response, stating that she had tried on three occasions to get Ms. Tardif to see Mr. D before Ms. Tardif left for home. PRDSMF ¶ 13. The Court included a portion of Ms. Schott's denial because the Kindred Defendants' paragraph asserts that the attempt to contact Dr. Keiski was the first thing Ms. Schott did after seeing Mr. D.

that the Monarch Center was not required to have a nurse in the facility at all times, and that the resident could be transferred to the hospital in the event of a medical emergency.[31]  DSMF ¶ 16; PRDSMF ¶ 16.  The Monarch Center was not required to, and did not, staff a licensed nurse on duty in the building at all times.[32]  DSMF ¶ 17; PRDSMF ¶ 17.  Ms. Schott understood that state regulations only required that Assisted Living Facilities such as the Monarch Center provide a registered nurse within the facility "weekly."[33]  DSMF ¶ 18; PRDSMF ¶ 18.  Ms. Tardif was not able to fulfill the weekly registered nurse requirement because she is a Licensed Practical Nurse (LPN), rather than a Registered Nurse (RN).  DSMF ¶ 19; PRDSMF ¶ 19.  Including Ms. Tardif, at least five nurses, two of whom were registered nurses, were on staff at the Monarch Center in March 2015.  DSMF ¶ 20; PRDSMF ¶ 20.

Ms. Schott was aware that two of Monarch's staff nurses, Michelle Walker and Era Brown, were unavailable that day, but she did not call either of the remaining nurses, Peggy Blood and Jennifer Courtois, to ask them to come into the facility. DSMF ¶ 21; PRDSMF ¶ 21.  Ms. Schott was under the impression that Jennifer

---

[31]     Ms. Schott interposed a qualified response, stating that Ms. Yesue asked her about available clinical coverage and asked if Jessie Morin, another Monarch employee, was a nurse. PRDSMF ¶ 16. In addition, Ms. Schott asserts that Ms. Yesue did not advise her what to do in this situation.  *Id.*  The Court included Kindred Defendants' paragraph sixteen because the qualified responses do not undercut the truth or falsity of the paragraph itself.  By making these assertions in her response and not including them in her additional facts, Ms. Schott deprived the Kindred Defendants of a response.

[32]     Ms. Schott interposed a qualified response, stating that the Kindred Defendants had not provided an expert opinion on this statement.  PRDSMF ¶ 17.  The Court is nonplussed at this objection.  The Kindred Defendants cite Ms. Schott's deposition testimony for this proposition and the Court assumes that as the Executive Director of the Monarch Center, Ms. Schott must have known whether it was required to have a nurse present at the facility at all times.  The Court rejects Ms. Schott's qualified response to her own testimony.

[33]     Surprisingly Ms. Schott interposed a qualified response to this paragraph on the ground that it was not supported by expert testimony.  PRDSMF ¶ 18.  Here the Kindred Defendants are asserting what Ms. Schott herself understood, and the Court is baffled why expert testimony would be necessary to establish what Ms. Schott understood.  The Court rejects her qualified response.

Courtois was on vacation on March 9, 2015.[34]  PRDSMF ¶ 21.  Even though Ms.
Schott thought Ms. Courtois was on vacation, Nurse Courtois arrived at the Monarch
Center at 4:30 p.m. on March 9, 2015.[35]  DSMF ¶ 22; PRDSMF ¶ 22.

After calling Ms. Yesue, Ms. Schott spoke with Dr. Keiski.  DSMF ¶ 23;
PRDSMF ¶ 23.  In her sworn statement to the Maine Human Rights Commission
(MHRC), Ms. Schott gave the following description of her phone call with Dr. Keiski
on March 9, 2015 and the actions she took after the phone call:

> I told Dr. Keiski that Ms. Tardif went home sick.  The "D" family was
> right next to me when I was on the phone with the doctor.  The "D"
> family gave a direct order for the Monarch staff not to give PD the
> Zyprexa medication.  The family was adamant.  Dr. Keiski was aware
> that the family did not want the medication, thus directed that the
> medication should be withheld until she was able to see PD on
> Wednesday.  I relayed Dr. Keiski's and the "D" family's directive to the
> staff by phone.  Dr. Keiski also told me that if the "D" family continued
> to express serious concerns over their father's health, then staff should
> call 911 and have PD brought to Maine Medical Center by ambulance.
> That's exactly what happened.   PD was transferred to MMC that
> afternoon before the 2nd shift . . . .
>
> Dr. Kieski and the "D" family issued the directive to hold the Zyprexa
> and under those emergency circumstances (the "D" family was adamant
> that PD not receive another dosage of Zyprexa), it fell to me, as
> Executive Director, to relay the message regarding this directive to the
> staff given that there was no clinical person present to do so.[36]

---

[34]    The Court included this additional statement because the Kindred Defendants' paragraph
twenty-one leaves the impression that Ms. Schott negligently failed to contact Nurse Courtois, when
she has an explanation for her failure to contact Ms. Courtois. Ms. Schott also asserts that it was the
responsibility of the Director of Services or the wellness nurse to obtain coverage. The Court has not
added this statement because by making these assertions in her response and not including them in
her additional facts, Ms. Schott deprived the Kindred Defendants of a response.
[35]    The Kindred Defendants' paragraph twenty-two does not mention that Ms. Schott thought
Nurse Courtois was on vacation, and Ms. Schott interposed a qualified response for this reason.
PRDSMF ¶ 22.  The Court added Ms. Schott's reiterated statement that she did not know Nurse
Courtois was available.
[36]    Ms. Schott interposed a qualified response.  PRDSMF ¶ 24.  She did not deny the statement
itself, but she explained that she had clarified this statement many times.  Id.  In her clarification,
she said that she did not relay an order, only Dr. Keiski's and the family's concerns.  Id.  The Court has
not included this clarification because it does not undermine the veracity of the Kindred Defendants'

DSMF ¶ 24; PRDSMF ¶ 24.  Ms. Schott's MHRC charge bears her signature in three places, including a declaration "under penalty of perjury that the foregoing is true and correct," as well as the statement "I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief."[37] DSMF ¶ 51; PRDSMF ¶ 51.

Dr. Keiski had known Ms. Schott for two-and-one-half years, and knew Ms. Schott was not a licensed or registered nurse.[38]  PSAMF ¶ 29; DRPSAMF ¶ 29.  Dr. Keiski was aware that the D family did not want Mr. D to receive the medication, but that she could not give Ms. Schott a medical order.[39]  PSAMF ¶ 30; DRPSAMF ¶ 30. Ms. Schott told Dr. Keiski that Ms. Tardif went home sick.  PSAMF ¶ 31; DRPSAMF ¶ 31.  Mr. D's son was present with Ms. Schott while Ms. Schott was on the phone to Dr. Keiski.  *Id.*  Dr. Keiski could hear that the family wanted to discontinue the

statement, which is simply a quotation from her MHRC declaration, and because the substance of her clarification is included elsewhere.  *See* PSAMF ¶¶ 36, 38, 50.

[37]    Ms. Schott interposed a qualified response.  PRDSMF ¶ 51.  She states that her MHRC charge does not state that she took a "physician's order."  *Id.*  As the Kindred Defendants' paragraph fifty-one does not assert that she stated that she took a physician's order, the Court overrules Ms. Schott's qualified response.

[38]    The Kindred Defendants object to paragraph twenty-nine on the ground that Ms. Schott fails to demonstrate the basis of Dr. Keiski's personal knowledge.  DRPSAMF ¶ 29.  The Court overrules the Kindred Defendants' objections because Ms. Schott states that she and Dr. Keiski had known each other for two-and-one-half years and this, in the Court's view, is sufficient to establish Dr. Keiski's personal knowledge.

[39]    The Kindred Defendants object to paragraph thirty on the ground that Ms. Schott fails to demonstrate the basis of Dr. Keiski's personal knowledge and on the basis that it reflects an impermissible self-contradiction meant to withstand summary judgment.  DRPSAMF ¶ 30.  The Court overrules the Kindred Defendants as to the latter point for reasons explained in the discussion section of this order.  Regarding the basis for Dr. Keiski's personal knowledge, it has been established, per the preceding footnote, that Dr. Keiski knew Ms. Schott was not a licensed or registered nurse.  It follows that she knew that she could not give Ms. Schott a medical order.  With respect to Dr. Keiksi's knowledge of the D family's wishes, Ms. Schott provides a valid foundation—that she, while in the D family's presence, relayed their concerns to Dr. Keiski in a telephone call.  The Court overrules the objection.

Zyprexa medication. PSAMF ¶ 32; DRPSAMF ¶ 32. Dr. Keiski said the medication should be withheld until she was able to see Mr. D. a couple of days later. *Id.* Ms. Schott told Dr. Keiski that she was not a nurse and therefore could not take an order.[40] *Id.* Dr. Keiski told Ms. Schott that if Mr. D's family continued to express serious concerns over his health, they should call 911 and send him to the hospital. *Id.*

After speaking with Dr. Keiski, Ms. Schott called down to Mr. D's unit from her office.[41] DSMF ¶ 25; PRDSMF ¶ 25. Ms. Schott did not believe that Dr. Keiski had given her an order; she believed that Dr. Keiski acknowledged that the family did not want Zyprexa.[42] PSAMF ¶ 33; DRPSAMF ¶ 33. Ms. Schott did not feel she had any responsibility to make sure Mr. D did not receive any more Zyprexa after she spoke to Dr. Keiski.[43] PSAMF ¶ 34; DRPSAMF ¶ 34. Ms. Schott felt Mr. D's life was in danger because Ms. Tardif left the community unattended and without coverage.[44] PSAMF ¶ 35; DRPSAF ¶ 35. Ms. Schott explained in her deposition that her contact

[40] The Kindred Defendants object to this statement in paragraph thirty-two on the ground that this statement is contradictory. DRPSAMF ¶ 32. The Court does not view the statement as contradictory,even if Dr. Keiski knew that Ms. Schott was not a nurse and could not take a medication order. Here, Ms. Schott was explaining to Dr. Keiski that there was no nurse on premises and she herself could not take an order. This version of the events is supported by Ms. Schott's own testimony, which is sufficient. *See* PSAMF ¶ 32 (citing *Schott Dep.* 163:2-164:12).

[41] Ms. Schott interposed a qualified response. PRDSMF ¶ 25. She affirmatively states that she called down to let the staff know of Dr. Keiski's and the family's concerns and also to let them know that Mr. D would be transferred to the hospital. *Id.* The Court has not included these statements because they do not contradict the asserted fact, namely that she called Mr. D's unit.

[42] The Kindred Defendants deny paragraph thirty-three on the ground that it contradicts other evidence. DRPSAMF ¶ 33. The Court disagrees and includes paragraph thirty-three in the statement of facts.

[43] The Kindred Defendants deny paragraph thirty-four on the ground that it contradicts other evidence. DRPSAMF ¶ 34. The Court disagrees and includes paragraph thirty-four in the statement of facts.

[44] The Kindred Defendants interposed a qualified response to paragraph thirty-five, pointing to other facts that they say contradict the statement. DRPSAMF ¶ 35. The Court disagrees and includes the statement.

with the staff, as stated in the Addendum to her Charge, was to relay Mr. D's family's and Dr. Keiski's concerns, and that she was going to send him to the hospital to be evaluated. PSAMF ¶ 36; DRPSAMF ¶ 36.

Ms. Schott alerted the staff because Mr. D was under their care, and they regularly inform the staff if someone from their neighborhood is being transferred to the hospital so that they are aware of the situation. PSAMF ¶ 37; DRPSAMF ¶ 37. Ms. Schott relayed the family's and Dr. Keiski's concerns to the staff at the same time she called to have Mr. D transferred to the hospital. PSAMF ¶ 38; DRPSAMF ¶ 38. Ms. Schott was concerned about Mr. D's health and wanted him to be seen by a doctor or a nurse. PSAMF ¶ 39; DRPSAMF ¶ 39.

Around 2 p.m., three hours after Mr. D's son began speaking with Ms. Schott about his concerns, Mr. D was transferred to the Maine Medical Center. DSMF ¶ 26; PRDSMF ¶ 26; PSAMF ¶ 22; DRPSAMF ¶ 22; PSAMF ¶ 40; DRPSAMF ¶ 40. Ms. Schott did not have Mr. D transferred to the hospital until after she had spoken with Dr. Keiski. DSMF ¶ 27; PRDSMF ¶ 27. From 10:44 a.m., the time Ms. Tardif left the Monarch Center, to 2:00 p.m., the time Mr. D was transferred, there was no doctor or nurse in the facility on March 9, 2015, and the only way for Mr. D to be seen by a doctor or nurse was to transfer him to the hospital.[45] DSMF ¶ 28; PRDSMF ¶ 28. Although Mr. D's Zyprexa dosage was "prn", his next regular dose was not scheduled

---

[45]     The Kindred Defendants' paragraph twenty-eight originally read: Given the lack of doctor or nurse in the facility, the only way for PD to be seen by a doctor or nurse was to transfer him to the hospital. DSMF ¶ 28. Ms. Schott denied the statement to the extent it omits reference to Ms. Tardif being present at Monarch and leaving without seeing Mr. D and without informing anyone of available backup. PRDSMF ¶ 28. The Court amended the Kindred Defendants' paragraph twenty-eight to reflect Ms. Schott's concerns.

to be administered until approximately 8:00 p.m.[46]  PSAMF ¶ 41; DRPSAMF ¶ 41.

Ms. Schott called Ms. Yesue to report what had transpired and to express her

concerns about Ms. Tardif's actions.[47]  PSAMF ¶ 42; DRPSAMF ¶ 42.  Ms. Schott

later wrote an email to Ms. Yesue to summarize what had happened and did not

mention anything about discontinuing Mr. D's medication or taking an order from

Dr. Keiski.  PSAMF ¶ 43; DRPSAMF ¶ 43.

### H.    Events on March 9, 2015 After Mr. D was Transferred

When RN Jennifer Courtois arrived at the Monarch Center on March 9, 2015,

Ms. Schott told her about the events with Mr. D earlier that day.  DSMF ¶ 29;

PRDSMF ¶ 29.  Although Ms. Schott told Ms. Courtois that she had not taken a

doctor's order, Ms. Courtois told her that she had improperly done so.[48]  DSMF ¶ 30;

PRDSMF ¶ 30.  Although Ms. Schott was not aware of it at the time, Ms. Courtois

wrote a note dated March 9, 2015, detailing her concerns about Ms. Schott's actions,

which states in part:

> Dr. Keiski had called + Pota told me that she gave her a verbal order to
> D/C Zypreza, both scheduled + PRN dose until further notice.  When she
> told me that she had done this + it was taken care of, he didn't receive
> it + that he had been sent to MMC to have psych eval + workup, I asked
> her if she had received a FAX order signed by Dr. Keiski.  She said "no."

---

[46]     Ms. Schott's paragraph forty-one indicates that Mr. D's next dose of Zyprexa was not scheduled
to be given until 8:00 p.m.  PSAMF ¶ 41.  However the Kindred Defendants pointed out that that Dr.
Keiski had ordered Zyprexa to be administered prn, which means "as needed."  DRPSAMF ¶ 41.  The
Court included the Kindred Defendants' statement in Ms. Schott's paragraph forty-one.

[47]     The Kindred Defendants interposed a qualified response, debating about whether Ms. Schott's
statements to Ms. Yesue about Ms. Tardif's actions constituted "concerns."  DRPSAMF ¶ 42.  The
Court overrules the Kindred Defendants' quibble.

[48]     The Kindred Defendants' paragraph thirty originally read: Ms. Courtois' response to Plaintiff
upon hearing Plaintiff's story was to tell her that Plaintiff had improperly taken a doctor's order.
DSMF ¶ 30.  Ms. Schott interposed a qualified response, indicating that she told Ms. Courtois that she
had not taken a doctor's order.  PRDSMF ¶ 30.  The Court amended paragraph thirty to reflect Ms.
Schott's recollection.

I asked if she had written this down, she said "no, she just told me to D/C it." I said, "Pota, you can't take a verbal order, you're not licensed! Only an LPN or RN can do that!" Her response was, "I knew you were coming in, can you take care of it?" I reiterated, you can not do this, you can not take verbal orders!" 4:45pm I paged Dr. Keiski (She is usually only on call until 4:30pm) she did not ever return page.[49]

DSMF ¶ 31; PRDSMF ¶ 31.

During the evening of March 9, 2015, Ms. Schott sent an email to Mary Yesue, explaining that Mr. D had been sent out for evaluation at the hospital earlier that day, writing in part:

> Mr. [D] (new resident) was sent out to be evaluated at Maine Medical Center. Mr. [D]'s son, [TD] came in this morning wanting to speak with both me and Laura about his father's care. Laura had already spoken to him 5 or 6 times over the weekend to reassure him. Laura came in today but is still sick and went back home . . . . The family had a lot of concerns and felt that he needed to be evaluated. I spoke with both the son and daughter for hours to reassure them that he is transitioning into our environment.

DSMF ¶ 32; PRDSMF ¶ 32.

## I.  Events After March 9, 2015 Leading to Potitsa Schott's Suspension

Ms. Schott does not know what would have been done differently on March 9, 2015 if there had been a nurse present at the Monarch Center.[50]  DSMF ¶ 33; PRDSMF ¶ 33.  On March 11, 2015, Ms. Yesue received Ms. Courtois' note and met

---

[49]     Ms. Schott interposed a qualified response, indicating that although Ms. Courtois wrote this note, Ms. Schott denies its allegations.  PRDSMF ¶ 31.  The Court included paragraph thirty-one in its recitation of the facts because it is an accurate reflection of what Ms. Courtois wrote contemporaneously with the events and is a part of Mr. D's medical record at the Monarch Center.

[50]     Ms. Schott interposed a qualified response, stating that as she is not a clinician, she does not know what a clinician would have done, but she believes it would have been handled differently if Ms. Tardif had come out, at least in terms of the stress on the family.  PRDSMF ¶ 33.  The Court is skeptical about paragraph thirty since it lacks any probative value.  It makes a statement about what would have happened if what actually happened had not happened.  The Court included the statement but gives it little weight.

with Ms. Schott to discuss the note's contents. DSMF ¶¶ 34-35; PRDSMF ¶¶ 34-35. When asked by Ms. Yesue, Ms. Schott denied entering any notes on Mr. D's medical record and making any medical decisions herself regarding whether to administer or discontinue medication but acknowledged that she called Dr. Keiski and relayed Dr. Keiski's directive to the Monarch staff. DSMF ¶ 36; PRDSMF ¶ 36. Ms. Schott clarified that she relayed Dr. Keiski's and the D family's "concerns" to the Monarch staff, but denied that her relayed message in any way constituted an "order."[51] PRDSMF ¶ 36. Although Ms. Schott denies accepting an order from Dr. Keiski, she acknowledges that for her to accept a physician's order to discontinue medicine would have been a violation of state regulation. DSMF ¶ 37; PRDSMF ¶ 37. Ms. Yesue informed Ms. Schott that she was suspended pending the outcome of the investigation into the events of March 9, 2015. DSMF ¶ 38; PRDSMF ¶ 38.

Also on Wednesday, March 11, 2015, Dr. Keiski came to Monarch to make her rounds.[52] PSAMF ¶449; PRDSAMF ¶ 44. Dr. Keiski raised her concerns about Ms. Tardif's nursing abilities and attitude with Ms. Schott and Ms. Yesue, who was also present at Monarch.[53] *Id.* Ms. Yesue arrived at Monarch in the late afternoon of

---

[51] Ms. Schott interposed a qualified response to the Kindred Defendants' paragraph thirty-six. PRDSMF ¶ 36. The Court included Ms. Schott's qualification in this sentence, because it explains her view of what occurred and without the explanation, the Kindred Defendants' paragraph thirty-six would be misleading.

[52] The Kindred Defendants objected to this statement on the ground that it is hearsay. DRPSAMF ¶ 44. The Court overrules the objection. Ms. Schott physically saw Dr. Keiski on Wednesday, March 11, 2015 and therefore her observation of Dr. Keiski is not hearsay.

[53] The Kindred Defendants objected to this statement on the ground that it is hearsay. DRPSAMF ¶ 44. The Court disagrees. The Court views Dr. Keiski's statement as corroborating Ms. Schott's concerns about Ms. Tardif and therefore they are not for the truth of the matter but for the fact that it was not Ms. Schott alone who expressed concerns to Kindred management about Ms. Tardif. The Kindred Defendants also object on the ground that "[i]t is clear . . . that Dr. Keiski's concerns did not relate to the March 9 incident." DRPSAMF ¶ 44. The Court views this objection as arguing the facts, which the Court must view in the light most favorable to Ms. Schott.

March 11, 2015, and she never asked Dr. Keiski if she had given Ms. Schott an order. PSAMF ¶ 45; DRPSAMF ¶ 45. Ms. Yesue claims that she may not have learned about the incident until after Dr. Keiski left. *Id.* Ms. Schott testified that after she spoke to Ms. Yesue on March 11, 2015 and told her about what had happened, Ms. Yesue told her to go home while she conducted an investigation. PSAMF ¶ 46; DRPSAMF ¶ 46. Before Ms. Schott left, she met with Dr. Keiski to discuss Dr. Keiski's concerns about Ms. Tardif.[54] *Id.*

### J. Kindred's Investigation and Termination of Potitsa Schott

Mr. Newman, who lives in Ohio, was not present at the Monarch Center during the investigation but directed Ms. Yesue and Mr. Hanscom to conduct the investigation.[55] DSMF ¶ 39; PRDSMF ¶ 39. Meanwhile, Ms. Yesue and Regional Human Resources Manager Gregg Hanscom purportedly conducted an investigation into the situation with Mr. D and reviewed a note drafted by RN Jennifer Courtois.[56] PSAMF ¶ 47; DRPSAMF ¶ 47. Mr. Hanscom spoke to several of the staff members who had been on duty on March 9, 2015.[57] DSMF ¶ 40; PRDSMF ¶ 40.

---

[54] The Kindred Defendants objected to this statement on the ground that it is hearsay. DRPSAMF ¶ 46. The Court overrules the hearsay objection because it does not view Dr. Keiski's statement as being offered for the truth of the matter.

[55] Ms. Schott denied that Mr. Newman oversaw the investigation. PRDSMF ¶ 39. The Court has omitted this portion of the Kindred Defendants' paragraph thirty-nine because it is required to view contested factual issues in the light most favorable to Ms. Schott.

[56] The Kindred Defendants objected to this statement on the ground that "meanwhile" could be interpreted as meaning just in the two minute interval that Ms. Schott had met with Dr. Keiski. DRPSAMF ¶ 47. The Court overrules the objection because it does not interpret "meanwhile" to be so restricted.

[57] The Kindred Defendants assert in paragraph forty that both Mr. Hanscom and Ms. Yesue spoke to several staff members who were present on March 9, 2015. DSMF ¶ 40. Ms. Schott denied that Ms. Yesue did so. PRDSMF ¶ 40. She did not deny that Mr. Hanscom did so. *Id.* The Court altered the paragraph to reflect Ms. Schott's denial.

Mr. Newman testified that he was not involved in the investigation and had delegated the investigation responsibility to Ms. Yesue and Mr. Hanscom.[58]  PSAMF ¶ 57; DRPSAMF ¶ 57.  When asked if he had a role in the investigation, Mr. Newman stated: "No, I – I really was not there investigating, no, that's correct."[59]  PSAMF ¶ 65; DRPSAMF ¶ 65.  Mr. Newman acknowledged that there were several occasions in which Ms. Schott complained to him that she did not think Ms. Yesue was impartial and that Ms. Yesue had shown favoritism toward Ms. Tardif.[60]  PSAMF ¶ 58; DRPSAMF ¶ 58.  Mr. Newman also acknowledged that he could have assigned someone other than Ms. Yesue to conduct the investigation.  PSAMF ¶ 59; DRPSAMF ¶ 59.  Mr. Newman did not give Mr. Hanscom or Ms. Yesue any guidelines by which to conduct the investigation.  PSAMF ¶ 60; DRPSAMF ¶ 60.  Mr. Newman could not recall whether Ms. Tardif was interviewed as part of the investigation; she was not interviewed.  PSAMF ¶ 61; DRPSAMF ¶ 61.  When asked who was available for clinical coverage after Ms. Tardif left on March 9, 2015, Mr. Newman said, "I don't know for sure so I'm not going to answer that.  I really don't recall."  PSAMF ¶ 62; DRPSAMF ¶ 62.  Mr. Newman claimed that the purported order, which Kindred

---

[58]    The Kindred Defendants interposed a qualified response.  DRPSAMF ¶ 57.  The qualification, however, does not contradict Ms. Schott's paragraph fifty-seven and the Court rejects it, because the Court is required to view the evidence in the light most favorable to Ms. Schott.

[59]    The Kindred Defendants interposed a qualified response to this statement.  DRPSAMF ¶ 65.  The qualification, however, does not contradict the statement and, as the Court is required to view the facts in the light most favorable to Ms. Schott, it accepted her statement without qualification.

[60]    The Kindred Defendants interposed a qualified response to this statement.  DRPSAMF ¶ 58.  The Court rejects it for the same reasons set forth in the preceding footnote.

alleges Ms. Schott accepted from Dr. Keiski, was "acted upon."[61]   PSAMF ¶ 63;

DRPSAMF ¶ 63.   Mr. Newman claimed that Ms. Schott was terminated because she

admitted to taking a physician's order, that the allegation that she "transcribed" it

was irrelevant, that he never heard her admit to taking the order, and that he never

asked her if she admitted to taking the order.[62]   PSAMF ¶ 64; DRPSAMF ¶ 64.

Other than what Ms. Yesue discussed with Ms. Schott, Ms. Yesue's only source

of information about what occurred on March 9, 2015 came from Nurse Courtois' note

and Mr. D's medical record.   PSAMF ¶ 48; DRPSAMF ¶ 48.   Regarding Nurse

Courtois' note, Ms. Yesue only "saw her piece of paper when [she] was there

Wednesday . . . ."   *Id.*   Ms. Yesue did not recall speaking with Nurse Courtois.[63]   *Id.*

Ms. Yesue reviewed Mr. D's Medication Administration Record (MAR) on which a

notation had been written in blue ink to "hold" the medication Zyprexa.   DSMF ¶ 41;

PRDSMF ¶ 41.   According to Ms. Yesue, although she did not say that Ms. Schott

wrote the note, nursing staff would not have used blue ink, and the handwriting

looked similar to Ms. Schott's.[64]   DSMF ¶ 42; PRDSMF ¶ 42.   Ms. Yesue asked Ms.

Schott about the allegations in Nurse Courtois' note, e.g. that Ms. Schott purportedly

---

[61]     The Kindred Defendants interposed a qualified response to this statement.   DRPSAMF ¶ 63.
The qualification, however, does not contradict the statement and, as the Court is required to view the
facts in the light most favorable to Ms. Schott, it accepted her statement without qualification.
[62]     The Kindred Defendants interposed a qualified response to this statement.   DRPSAMF ¶ 64.
The qualification, however, does not contradict the statement and, as the Court is required to view the
facts in the light most favorable to Ms. Schott, it accepted her statement without qualification.
[63]     The Kindred Defendants interposed a qualified response to this statement.   DRPSAMF ¶ 48.
The Court is not quite clear about the reason for the qualification.   The Kindred Defendants state that
Ms. Yesue testified that she "may have" spoken with Nurse Courtois, but she certainly read Nurse
Courtois' note.   *Id.*   The difference between "may have" and "did not recall" is immaterial to the
resolution of this motion.
[64]     Ms. Schott interposed a qualified response, noting that Ms. Yesue acknowledged in her
deposition testimony that she did not say that Ms. Schott wrote the note.   PRDSMF ¶ 42.   The Court
amended the paragraph to respond to Ms. Schott's qualification.

told Ms. Courtois that she had "taken an order from Dr. Keiski to discontinue Mr. D's medication" and that Ms. Schott had written in Mr. D's MAR to hold Mr. D's medication. PSAMF ¶ 50; DRPSAMF ¶ 50. Ms. Schott told Ms. Yesue that she did not take an order from Dr. Keiski, and she did not write in Mr. D's MAR.[65] *Id.* Ms. Schott relayed Mr. D's family's and Dr. Keiski's concern to staff just before she called to have Mr. D transferred to the hospital. *Id.* During her discussion with Ms. Yesue on March 11, 2015, Ms. Schott told her that Ms. Tardif refused to meet with Mr. D's family and had left the facility without clinical coverage, and that Ms. Schott made no medical decision to discontinue Mr. D's medications and sent Mr. D to the hospital because she believed that it to be an emergency medical situation. PSAMF ¶ 51; DRPSAMF ¶ 51. Ms. Yesue did not speak to any member of Mr. D's family about what had occurred. PSAMF ¶ 49; DRPSAMF ¶ 49.

Ms. Yesue prepared a report and relayed the findings of the investigation to Mr. Newman by phone.[66] DSMF ¶ 43; PRDSMF ¶ 43. On March 12, 2015, Ms. Yesue and Gregg Hanscom met with Ms. Schott, with Mr. Newman participating by phone. *Stip.* ¶ 11; PSAMF ¶ 52; DRPSAMF ¶ 52. At the March 12, 2015 meeting, Ms. Yesue gave a PIP to Ms. Schott, which stated the results of the investigation. DSMF ¶ 44; PRDSMF ¶ 44. The March 12, 2015 PIP stated that Ms. Schott was to be discharged and gave the following reason:

---

[65]    The Kindred Defendants interposed a qualified response to the portion of this statement that says Ms. Schott told Ms. Yesue that she had not taken an order from Dr. Keiski. DRPSAMF ¶ 50. The Kindred Defendants point to other statements by Ms. Schott in which they say she admitted taking an order from Dr. Keiski. *Id.* The Court overrules the Kindred Defendants' qualified response because it is required to view the facts in the light most favorable to Ms. Schott.

[66]    Ms. Schott interposed a qualified response, stating that Mr. Newman did not prepare the report. PRDSMF ¶ 43. The Court omitted the reference to Mr. Newman.

Acting outside the scope of practice, as evidenced by: accepting and transcribing a physician's telephone order on to resident P.D.'s MAR (Medication Administration Record). Denying that she wrote on MAR "hold until further notice." When asked by Mary Yesue DDCO directly if she wrote "hold until further notice," Pota Schott stated "no." Pota stated she "called down to the unit and told them to 'hold' the Zyprexa." On examining the MAR, the statement "Hold until further notice" was printed in blue ink. When comparing the printed statement to other printed memos by Pota Schott, the font and printing style is very similar. I interviewed Lisa Howard CRMA, who was in possession of the keys and responsible for medication passes on 3/9/15 for the 3-11 shift. Lisa stated that the MAR was turned over, indicating that the resident was either discharged or in the process of being sent out of the hospital. Lisa stated that when she observed resident P.D.'s MAR she noted that his Zyprexa scheduled for 8PM on 3/9/15 and Zyprexa PRN had notation beside medication to "hold until further notice." Lisa Howard CRMA denied writing this.

This is a clear violation of the Regulations governing Level 4 Assisted Living Maine Facilities: Section 7 (7.1.6) "No medication shall be administered or discontinued without a written order signed by a duly authorized licensed practitioner or other person licensed to prescribe medications." Section 7 (7.2.21). Telephone orders shall be accepted only by a registered or licensed nurse or pharmacist.

I also interviewed Jennifer Courtois RN who worked 5-9PM on 3/9/15. Jennifer stated that when she came on duty she checked in with Pota Schott. Jennifer stated that P.D.'s physician had told Pota Schott over the telephone to "hold resident P.D.'s Zyprexa." Jennifer stated that she immediately told Pota Schott that Pota was not authorized to accept physician's orders. Jennifer stated that Pota Schott asked her if "she could take care of that for her." Jennifer states that she told Pota that she would try to reach resident P.D.'s physician and clarify order. However, resident P.D.'s physician was unavailable and Jennifer did not feel it was appropriate to ask the on call physician to clarify another physician's "order." Resident P.D. was transferred to the hospital and admitted on 3/9/15 at 10:10PM.

*Stip.* ¶ 12; PSAMF ¶ 52; DRPSAMF ¶ 52. The PIP concluded that Ms. Schott improperly entered notes on Mr. D's MAR. PSAMF ¶ 52; DRPSAMF ¶ 52.

Ms. Yesue testified that she relied on the fact that the MAR notation to "hold" the Zyprexa was written in blue ink and there was a similarity in the handwriting to notes on Ms. Schott's desk.[67]  PSAMF ¶ 53; DRPSAMF ¶ 53.  When questioned about whether Ms. Schott admitted to taking an order over the telephone, Ms. Yesue testified: "She didn't admit to me.  She might have admitted it to me.  I'm going by— this is what I used for my report, what Jennifer write in there.  I might have asked her.  I don't recall a conversation with Pota."[68]  PSAMF ¶ 54: DRPSAMF ¶ 54.  During the meeting, Ms. Schott again denied that she had taken an order, that she had exceeded the scope of her authority, that she had discontinued medication, and that she had written in Mr. D's MAR, and she told them that she had helped a resident get appropriate help during a dangerous situation, and that the family thought their father was going to die.[69]  PSAMF ¶ 55; DRPSAMF ¶ 55.

Ms. Schott refused to sign the PIP and was informed that her employment would be terminated as of that day.  *Stip.* ¶ 13.  Mr. Schott did not bring up any concerns about Ms. Tardif at the meeting.  DSMF ¶ 45; PRDSMF ¶ 45.  Although Mr.

---

[67]    Ms. Schott's paragraph fifty-three stated: "Ms. Yesue's 'proof' that Ms. Schott had made the MAR entry was her opinion that the handwriting on the MAR entry appeared to be similar to Ms. Schott's handwriting.  PSAMF ¶ 53.  The Kindred Defendants objected on the ground that this statement was not supported by Ms. Schott's record citation.  The Court reviewed the cited portion of Ms. Schott's deposition and agrees with the Kindred Defendants that the cited portion does not support the contents of the paragraph.  Nevertheless, the Kindred Defendants affirmatively set forth Ms. Yesue's testimony, which is substantially similar to Ms. Schott's paragraph fifty-three and the Court inserted the Kindred Defendants' language.  DRPSAMF ¶ 53.

[68]    The Kindred Defendants denied this paragraph, citing other portions of the record.  DRPSAMF ¶ 54.  The Court rejects the Kindred Defendants' denial.  The language in Ms. Schott's paragraph fifty-four is found in the cited portions of Ms. Yesue's deposition.  The Court must view contradictory facts in the light most favorable to Ms. Schott.

[69]    The Kindred Defendants interposed a qualified response to paragraph fifty-five on the ground that there is countervailing evidence elsewhere.  DRPSAMF ¶ 55.  The Court accepts Ms. Schott's version because it is supported by the record citation and the Court is required to view conflicting evidence in the light most favorable to Ms. Schott.

Newman acknowledged that he is not a clinician and is not able to say what is clinically right or wrong, Mr. Newman believed that Ms. Schott had options aside from accepting a telephone order from a physician, including transferring the resident to the hospital earlier or obtaining a fax order.[70]  DSMF ¶ 50; PRDSMF ¶ 50.  Ms. Yesue and Mr. Newman immediately terminated Ms. Schott at the end of the meeting.  PSAMF ¶ 56; DRPSAMF ¶ 56.  Even after being told she was terminated, Ms. Schott told Ms. Yesue and Mr. Newman that the findings in the report were false.[71]  *Id.*

### K.     Mr. D's Death and Kindred Response to the Schott Termination

After Ms. Schott's termination, Mr. D died in hospice care on March 17, 2015.  DSMF ¶ 46; PRDSMF ¶ 46; PSAMF ¶ 22; DRPSAMF ¶ 22. On or around April 7, 2015, Mr. Newman met with Eleni Kowash and Edie Rossborough, two family members of other Monarch Center residents to discuss with them the reasons for Ms. Schott's termination, and, at Ms. Schott's request, the family members sent her

---

[70]     Ms. Schott interposed a qualified response, setting forth the qualification that the Court has inserted in the first phrase of this paragraph.  PRDSMF ¶ 50.

[71]     The Kindred Defendants denied this statement, claiming that Ms. Schott testified that "the meeting ended with me getting terminated."  DRPSAMF ¶ 56.  This denial is frivolous and the Court overrules it.  At her deposition, Ms. Schott testified:

> The meeting ended with me getting terminated.  They said that I violated a code and that they - - and Mr. Newman said, Mary - - Mary did a thorough investigation, and we're going to have to discharge you.  And that's when I let them again know that - - I said, I've done so many things for - - for the Monarch Center, which I had done a lot of good things for the Monarch Center in the last two-and-a-half years for them.  And in regards to this, this is false.  I wasn't signing it.

*Schott Dep.* 217:20-218:5.  Ms. Schott's testimony makes it extremely clear that after she was told she was terminated, she told them that the findings in the report were false.  There is no basis for the Kindred Defendants' denial of this statement.

summaries of their conversation.[72]  DSMF ¶¶ 47-48; PRDSMF ¶¶ 47-48; PSAMF ¶ 66: DRPSAMF ¶ 66.  According to the family members' statements, Mr. Newman told them (1) that Ms. Schott chose to act in a clinical manner when she was not licensed to do so; (2) that there were other options available to Ms. Schott and there was a clinician in the building who could have handled the situation; (3) that Ms. Schott was not forced to act in the way she did because of an emergency and the "walls were [not] going to fall down;" and (4) that the internal investigation into Plaintiff's behavior had been conducted by Mr. Newman "personally."[73]  DSMF ¶ 49; PRDSMF ¶ 49; PSAMF ¶ 67; DRPSAMF ¶ 67.  According to the contemporaneous handwritten notes of the family members, Mr. Newman specifically said that Ms. Schott "acted in a clinical manner when she was not licensed to do so," that there "was a clinician in the building who should have handled the situation," that Ms. Schott "knew that there were consequences for her actions," and that her unlicensed acts "forced his hand" to fire her.[74]  PSAMF ¶ 67; DRPSAMF ¶ 67.  Upon reviewing Ms. Kowash's statement and Ms. Rossborough's statement, Mr. Newman said that both statements were consistent with his memory of how the conversations went with the family

---

[72]    Ms. Schott interposed a qualified response to paragraph forty-eight, objecting to the implication that she had requested that Mr. Newman meet with these families.  PRDSMF ¶ 48.  The Court has drawn no such implication.

[73]    Ms. Schott admitted that Mr. Newman made these statements.  PRDSMF ¶ 49.  However, she interposed a qualified response, asserting that he made other statements as well.  *Id.*  The Court has not included these additional statements because they are better placed in Ms. Schott's additional statements.

[74]    The Kindred Defendants interposed a qualified response to the quotations in this statement.  DRPSAMF ¶ 67.  However, the quotations appear in the cited handwritten notes that the family members took of their meeting with Mr. Newman.  The Court amended the statement to clarify that the quotations come from the family members' handwritten notes.  The Kindred Defendants' statement that "[b]oth statements speak for themselves" is frivolous.

members.  PSAMF ¶ 68; DRPSAMF ¶ 68.  Mr. Newman acknowledged that calling 911 was the appropriate thing to do when the facility could not meet the clinical needs of a resident, and was aware that Mr. D passed away some time after his discharge from the Monarch Center.  PSAMF ¶ 69; DRPSAMF ¶ 69.  Although Mr. Newman claims he was unaware of any misconduct by Mr. Hanscom, Ms. Tardif claims that Mr. Hanscom had sexually inappropriate communications with her; however, Ms. Tardif also testified that she did not report these communications to Mr. Newman or anyone else at Kindred.[75]  PSAMF ¶ 71; DRPSAMF ¶ 71.

After the position was held by an interim Executive Director for several months, Ms. Tardif was promoted to be the Executive Director of the Monarch Center in June 2015.[76]  PSAMF ¶ 70; DRPSAMF ¶ 70.  Jennifer Courtois was promoted to Director of Nursing when Ms. Tardif vacated the position to assume Ms. Schott's former position as Executive Director.[77]  PSAMF ¶ 72; DRPSAMF ¶ 72.

## L.    Potitsa Schott's Maine Human Rights Commission Charge

In May 2015, Ms. Schott filed a sworn charge of discrimination with the MHRC, alleging whistleblower retaliation among other allegations.  *Stip.* ¶ 14.  Ms.

---

[75]    The Kindred Defendants interposed a qualified response to Ms. Schott's paragraph seventy-one, noting that although Ms. Tardif testified that Mr. Hanscom had sent inappropriate sexual text messages to her, she had never reported the matter to Mr. Newman or anyone at Kindred.  DRPSAMF ¶ 71.  The Court agrees that without this additional information, Ms. Schott's paragraph seventy-one is misleading and therefore it amended paragraph seventy-one to include this information.

[76]    The Kindred Defendants interposed a qualified response to Ms. Schott's paragraph seventy, noting that the Executive Director position was held on an interim basis for several months before Ms. Tardif was hired for the position.  DRPSAMF ¶ 70.  The Court amended the paragraph to include this information.

[77]    The Kindred Defendants interposed a qualified response to Ms. Schott's paragraph seventy-two, contending that Ms. Tardif did not "take over" Ms. Schott's position as Executive Director.  DRPSAMF ¶ 72.  The Court muted the language but conveyed the essential information.

Schott believed that the accusations against her were retaliation for her bringing to light a lot of complaints regarding, among other things, the care and safety of the residents, especially relating to Mr. D.[78]  PSAMF ¶ 73; DRPSAMF ¶ 73.  In her termination meeting, Ms. Schott was motivated to voice her objections to the accusations against her: she denied taking an order or writing in Mr. D's MAR and objected to Kindred's shifting of the blame from Ms. Tardif onto her.[79]  *Id.*

## III.  THE POSITIONS OF THE PARTIES

### A.  The Kindred Defendants' Position

#### 1.  Whistleblower Retaliation

The Kindred Defendants contend that Ms. Schott's whistleblower retaliation claim must fail because none of her complaints is protected by the MHRA or the MWPA, and therefore she did not engage in protected activity.  *Defs.' Mot.* at 9.  The Kindred Defendants say that Ms. Schott has identified three different acts that she believes qualify as protected activity under both statutes: (1) health and safety concerns regarding an elderly resident with dementia who was physically assaulting Monarch Center staff and was in rapid decline, (2) allegations of gross negligence against Laura Tardif who refused to respond to the crisis surrounding that same resident, and (3) opposition to the allegedly sham investigation by Mary Yesue and

---

[78]     The Kindred Defendants interposed a qualified response to Ms. Schott's paragraph seventy-three, contending that the citations do not support the characterization that she had brought "a lot of complaints" to Kindred's attention.  DRPSAMF ¶ 73.  The Court overrules the qualified response.

[79]     The Kindred Defendants interposed a qualified response to this portion of Ms. Schott's paragraph seventy-three.  DRPSAMF ¶ 73.  They say that she testified there was "no meeting.  It was just they were going to terminate me."  *Id.*  The Court declines to accept the Kindred Defendants' qualified response, which is bottomed on a disagreement on the facts and the Court is required to view contested facts in the light most favorable to Ms. Schott.

Brian Newman, which not only covered up for Ms. Tardif, but also falsely accused Ms. Schott of violating state regulations, leading to her termination. *Id.* at 10.

The Kindred Defendants, however, argue that neither of the first two complaints fits within the MHRA provisions, 26 M.R.S. § 833(1)(A) (reporting violations of law or rules), (B) (reporting a condition or practice that would put at risk the health and safety of an individual), or (E) (reporting to an appropriate licensing agency an act or omission that deviates from the applicable standard of care). *Id.* at 10-13. They also say that Ms. Schott did not oppose the Kindred Defendants' investigation in any tangible way and therefore her complaints do not come within the MWPA, 5 M.R.S. § 4633. *Id.* at 13-14.

Specifically, regarding the MHRA claim, the Kindred Defendants maintain that as to Mr. D, there is no evidence in the record that Ms. Schott had complained about Mr. D's treatment to any of her supervisors. *Id.* at 11. The Kindred Defendants dismiss Ms. Schott's report to Ms. Yesue about the lack of clinical coverage at Monarch on the ground that Ms. Yesue knew that Monarch was not required to have a nurse at the facility and she also knew that the resident could be transferred out to a hospital at any time. *Id.* The Kindred Defendants argue that Ms. Schott's evening email to Ms. Yesue fails to present any concerns about a condition or practice that would put health or safety at risk. *Id.* at 11-12. They say that is "no actual evidence that Plaintiff reported any health or safety concerns regarding PD." *Id.* at 12.

Similarly, the Kindred Defendants assert that Ms. Schott's call to Ms. Yesue about Ms. Tardif going home did not place Kindred on notice that the lack of clinical

coverage was unsafe, dangerous or illegal. *Id.* at 13. Furthermore, the Kindred Defendants argue that even if Ms. Schott made such a report, her concerns were not supported by reasonable cause. *Id.*

Turning to the Kindred investigation, the Kindred Defendants contend that Ms. Schott did not oppose an "act or practice that is unlawful under this Act." *Id.* at 14 (citing 5 M.R.S. § 4633). Ms. Schott's mere belief that Ms. Yesue was not impartial is insufficient, in the Defendants' view, to constitute a violation of the MHRA. *Id.* Moreover, the Kindred Defendants say that Ms. Schott never did anything to oppose what she believed was unlawful aspects of the investigation. *Id.* at 14.

### 2. The Defamation Claim

Noting that Ms. Schott's defamation claim is based solely on the interview that Brian Newman had with the two family members about Ms. Schott's termination, the Kindred Defendants maintain that Mr. Newman's statements were substantially true. *Id.* at 15-19. Furthermore, they argue that Mr. Newman was not negligent in making any statements about Ms. Schott. *Id.* at 19-21. Accordingly, the Kindred Defendants conclude that Ms. Schott may not maintain her defamation claim. *Id.* at 20.

### B. Ms. Schott's Response

Ms. Schott takes a much broader view of her dealings with Kindred and her complaints about Ms. Tardif. *Pl.'s Opp'n* at 3. She says that she began complaining to Kindred about Ms. Tardif in September, 2014, when she drafted a PIP outlining her concerns about Ms. Tardif's "performance and attitude." *Id.* After Ms. Schott

complained about Ms. Tardif, Kindred disciplined Ms. Schott on March 4, 2015 with a "final written warning PIP," claiming that Ms. Schott had been dishonest. *Id.* But Mr. Newman, the individual who issued the March PIP, could not explain how any of the issues that he labeled as dishonesty were actually dishonest. *Id.* Indeed, he could not explain why the March 4, 2015 PIP had been issued. *Id.* When Ms. Schott met with Mr. Newman on March 4, 2015, she reported specific concerns about Ms. Tardif's professional incompetence which had, in Ms. Schott's view, jeopardized the health and safety of Monarch residents. *Id.* at 3-4. Mr. Newman and Mr. Hanscom had replied that they "didn't want to hear anything about it." *Id.* at 4. Next, Ms. Schott complained again about Ms. Tardif the evening of March 9, 2015 after Mr. D had been transferred from Monarch. *Id.* at 6. Ms. Schott then points to her quick termination and a hasty investigation. *Id.* at 6-8.

Citing caselaw, Ms. Schott maintains that "the critical point" in analyzing whether a plaintiff has engaged in protected activity is her "motivation in making a particular report or complaint." *Id.* at 11 (quotng *Harrison v. Granite Bay Care, Inc.*, 811 F.3d 36, 51 (1st Cir. 2016) (citing *Cormier v. Genesis Healthcare, LLC*, 2015 ME 161, ¶ 11, 129 A.3d 944)). Those "motivated to stop a dangerous condition" are protected. *Id.* Ms. Schott says that *Cormier* is similar to her case. *Id.* at 12-13. Furthermore, she views her whole course of conduct as protected activity. *Id.* at 13-14. Specifically, she points to complaints Ms. Schott had made about the quality of Ms. Tardif's care. *Id.* at 14. Ms. Schott observes that she was notifying Kindred about Mr. D not only out of concern for his safety, but also for the safety of those at

Monarch caring for him. *Id.* at 14-15. Ms. Schott also says that her opposition to Kindred's "sham 'investigation'" is protected conduct. *Id.* at 15-16.

Regarding the defamation claim, Ms. Schott contends that Mr. Newman made a number of assertions about her that were simply not true. *Id.* at 8-10. Moreover, she contends that whether she actually took a physician's order over the phone is a factual issue that the jury must resolve. *Id.* at 17. Ms. Schott claims that *Marston v. Newavom*, 629 A.2d 587 (Me. 1993) is similar to her claim against the Kindred Defendants. *Id.* at 17-18.

## C.    The Kindred Defendants' Reply

In their reply, the Kindred Defendants state that Ms. Schott's Complaint made no mention of her earlier reports and they claim they have been denied fair notice of her claim under Federal Rule of Civil Procedure 8. *Defs.' Reply* at 1-2. Noting that Ms. Schott mentioned reports to Dr. Keiski and Ms. Tardif, the Kindred Defendants say that neither individual was Ms. Schott's employer and therefore these reports were not covered by the MWPA. *Id.* at 2-3. In any event, they maintain that her reports to Dr. Keiski and Ms. Tardif were not the reason for her termination. *Id.* at 3-4. They also dispute whether the prior reports were good faith reports about a health or safety condition. *Id.* at 4-5. The Kindred Defendants assert that, as Executive Director, Ms. Schott's job duties required her to make these types of reports to her employer. *Id.* at 5-6. They characterize Ms. Schott's report to Ms. Yesue regarding Ms. Tardif as "informational, rather than oppositional." *Id.* at 6. Finally,

they deny that Ms. Schott engaged in any oppositional conduct on March 11 or March 12, 2015.  *Id.* at 6-7.

Turning to the defamation claim, the Kindred Defendants point again to the contents of Ms. Schott's sworn claim to the MHRC as contradicting her current claims.  *Id.* at 7.  They also say that the defamation claim is not supported by the record.  *Id.*

### D.  Ms. Schott's Sur-Reply

In her sur-reply, Ms. Schott responds to the Kindred Defendants' contention that her Complaint did not place them on fair notice of her claim.  *Pl.'s Sur-Reply* at 2.  She first says that her MHRC complaint contained detailed information about her reports concerning Ms. Tardif's negligence or unsafe practices.  *Id.* at 2.  She also asserts that her fourteen-page Complaint is sufficient to place the Kindred Defendants on fair notice of her claim.  *Id.* at 3.  Also, Ms. Schott states that discovery, including the Kindred Defendants' extensive deposition of Ms. Schott herself, provided fair notice of her claim.  *Id.* at 3-4.

Regarding the causation defense, Ms. Schott maintains that the Kindred Defendants did not raise a causation defense, challenging the third element of the retaliation claim in their motion for summary judgment and she says they should not be permitted to do so now.  *Id.* at 4.  Ms. Schott points out that the Kindred Defendants failed to support their new arguments with record citations in violation of the local rule.  *Id.*  Ms. Schott contends that her reports to Dr. Keiski and Nurse Tardif qualify as reports to her employer.  *Id.* at 4-5.  Finally, she argues that she has

raised factual questions about the cause of her termination that require jury determination. *Id.* at 5-6.

### E. The Kindred Defendants' Sur-Response

In their sur-response, the Kindred Defendants lay the responsibility for new matters being raised at Ms. Schott's doorstep. *Defs.' Sur-Response* at 1. They say that these new matters appeared for the first time in Ms. Schott's opposition to their motion for summary judgment and they were neither in her Complaint nor in her pre-filing memorandum. *Id.* The Kindred Defendants claim that Ms. Schott may not raise her March 4, 2015 reports about Nurse Tardif, because her Complaint made no mention of them. *Id.* at 2-3. They claim that they were "sandbag[ged]" with multiple new reports. *Id.* at 3-4. The Kindred Defendants take the same position about the five alleged complaints Ms. Schott made to Dr. Keiski and Ms. Tardif. *Id.* at 4. The Kindred Defendants maintain that Ms. Schott's failure to identify her reports one through seven has been prejudicial to them since they did not know to pursue these issues in discovery. *Id.* at 4-5.

Regarding Ms. Schott's reports to Dr. Keiski and Nurse Tardif, the Kindred Defendants observe that since they were unaware of Ms. Schott's novel theory, they have not waived the right to defend on causation. *Id.* at 5. Furthermore, they say that neither Dr. Keiski nor Nurse Tardif was involved in the termination decision. *Id.* In addition, the Kindred Defendants point out that there is no evidence in the record that Ms. Schott ever told Ms. Yesue that she had reported the cancer treatment issue to Dr. Keiski or that she had complained to Ms. Tardif about her conduct. *Id.*

at 6-7. The Kindred Defendants ask the Court to limit Ms. Schott to what she revealed in her pre-filing memorandum. *Id.* at 7.

### F. Ms. Schott's Supplemental Brief

Ms. Schott disputes the Kindred Defendants' contention that this sentence from her MHRC declaration definitively establishes that she took an order from Dr. Keiski: "I relayed Dr, Keiski's and the 'D' family's directive to the staff by phone." *Pl.'s Suppl. Br.* at 1-2; DSMF ¶ 24; PRDSMF ¶ 24. She argues that her subsequent declarations and deposition testimony contextualized that sentence and "clarified that Dr. Keiski did not give Plaintiff and 'order', she did not take an 'order' from Dr. Keski, and that she merely 'relayed' the concerns of Dr. Keski and the D family to staff." *Pl.'s Suppl. Br.* at 1 (citing PRDSMF ¶¶ 24, 25, 30, 36, 37; PSAMF ¶¶ 26-38). She also rejects the Kindred Defendants' position that these subsequent declarations and testimony are inconsistent with her statement in the MHRC declaration and that Court cannot consider these statements because of their purported inconsistency. *Pl.'s Suppl. Br.* at 2.

Ms. Schott provides her view of the law of judicial estoppel and her arguments for why the doctrine does not apply to her later statements. *Id.* at 2-6. Specifically, applying the test set forth in *New Hampshire v. Maine*, 532 U.S. 742 (2001), Ms. Schott avers that (1) her later statements are consistent with her earlier statements; (2) the Kindred Defendants will not suffer unfair detriment because they will have the opportunity to cross-examine and attempt to impeach Ms. Schott; and (3) she has not misled the Court. *Id.*

### G. The Kindred Defendants' Supplemental Brief

In their supplemental brief, the Kindred Defendants dispute Ms. Schott's view about the applicability of judicial estoppel, *Defs.' Suppl. Br.* at 5-8, and they request that the Court "strike [Ms. Schott]'s deposition testimony" that they view as contradictory to her MHRC declaration. *Id.* at 1-2. They assert that (1) Ms. Schott's subsequent sworn statements are inconsistent with her MHRC statement; (2) the detriment they stand to suffer is "an unwarranted trial with its attendant uncertainty and significant excess cost"; and (3) the MHRC accepted her declaration. *Id.* at 6-8.

In addition to their argument about judicial estoppel, the Kindred Defendants assert that Ms. Schott is contradicting her MHRC declaration for purposes of generating a genuine issue of material fact in order to avoid summary judgment without also providing a satisfactory explanation of why the testimony has changed. *Id.* at 3-5. They claim that "there is no question that Plaintiff's deposition testimony contradicts her sworn MHRC charge." *Id.* at 4. They rely on *Zip Lube, Inc. v. Coastal Savings Bank,* 1998 ME 81, ¶ 10, 709 A.2d 733, 735 and *Escribano-Reyes v. Professional HEPA Certificate Corp.*, 817 F.3d 380, 386-87 (1st Cir. 2016) to support their contention that the Court should disregard Ms. Schott's statements characterizing her call with Dr. Keiski and her communications about that call to the Monarch staff, other than the one she first provided to the MHRC.

## IV. LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law." FED. R. CIV. P. 56(a). A fact is "material" if it "has the potential to change the outcome of the suit." *Tropigas de Puerto Rico, Inc. v. Certain Underwriters at Lloyd's of London*, 637 F.3d 53, 56 (1st Cir. 2011) (quoting *Borges ex rel. S.M.B.W. v. Serrano-Isern*, 605 F.3d 1, 5 (1st Cir. 2010)). A dispute is "genuine" if "a reasonable jury could resolve the point in favor of the nonmoving party." *Id.* (quoting *McCarthy v. Nw. Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir. 1995)).

Once this evidence is supplied by the moving party, the non-movant must "produce 'specific facts, in suitable evidentiary form, to . . . establish the presence of a trialworthy issue.'" *Triangle Trading Co., Inc. v. Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir. 1999) (quoting *Morris v. Gov't Dev. Bank of Puerto Rico*, 27 F.3d 746, 748 (1st Cir. 1994)). In other words, the non-moving party must "present 'enough competent evidence' to enable a factfinder to decide in its favor on the disputed claims." *Carroll v. Xerox Corp.*, 294 F.3d 231, 237 (1st Cir. 2002) (quoting *Goldman v. First Nat'l Bank of Boston*, 985 F.2d 1113, 1116 (1st Cir. 1993)). The Court then "views the facts and draws all reasonable inferences in favor of the nonmoving party." *Ophthalmic Surgeons, Ltd. v. Paychex, Inc.*, 632 F.3d 31, 35 (1st Cir. 2011). However, the Court "afford[s] no evidentiary weight to 'conclusory allegations, empty rhetoric, unsupported speculation, or evidence which, in the aggregate, is less than significantly probative.'" *Tropigas*, 637 F.3d at 56 (quoting *Rogan v. City of Boston*, 267 F.3d 24, 27 (1st Cir. 2001)); *accord Sutliffe v. Epping Sch. Dist.*, 584 F.3d 314, 325 (1st Cir. 2009).

Unlawful retaliation claims are evaluated with the "shifting burdens" analysis articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). *See Fennell v. First Step Designs, Inc.* 83 F.3d 526, 535 (1st Cir. 1996). Under that formula, Ms. Schott has the undemanding task of demonstrating a prima facie case of unlawful retaliation. *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 823 (1st Cir. 1991) (stating that "[t]he burden of making out a prima facie case is 'not onerous'") (citation omitted)).

If Ms. Schott can demonstrate the elements of her prima facie case of unlawful retaliation, the evidentiary burden shifts to the Kindred Defendants to articulate a legitimate, non-retaliatory reason for taking the adverse action against the plaintiff. *See Fennell*, 83 F.3d at 535. If it does so, the burden shifts back to Ms. Schott to demonstrate that the Kindred Defendants' non-retaliatory reasons were pretext and that the true reason they took the adverse action was retaliatory. *Id.*; *Smith v. Heritage Salmon*, 180 F. Supp. 2d 208, 216 (D. Me. 2002).

## V.    DISCUSSION

### A.    Fair Notice

The parties exchanged recriminations about the whether they have "sandbag[ged]" each other and, if so, who is sandbagging whom. The Court does not find helpful the countervailing accusations between counsel.

The Kindred Defendants' first claim is that the Plaintiff's Complaint did not place them on fair notice of her claim. However, absent special pleading requirements not applicable here, a plaintiff is allowed to allege only essential facts,

leaving for discovery and motion practice a more detailed description of her claim. FED. R. CIV. P. 8(a)(2) ("A pleading that states a claim for relief must contain: . . . (2) a short and plain statement of the claim showing that the pleader is entitled to relief"). Gaps in the allegations in a complaint are typically filled in by contention interrogatories, party depositions, and similar discovery vehicles.

Nor does the Court view Local Rule 56(h) as a vehicle to subject the parties to the type of waiver the Kindred Defendants urge. This case is an example. On June 30, 2017, the Kindred Defendants filed a notice of intent to file a motion for summary judgment. *Defs.' Notice of Intent to File Mot. for Summ. J. and Req. for Pre-filing Conf.* (ECF No. 30). On July 3, 2017, the Court issued a standard procedural order that required the Kindred Defendants alone, not Ms. Schott, to file a pre-filing memorandum. *Procedural Order* at 1 (ECF No. 31) ("Each party intending to file a motion for summary judgment ('movant') shall file a short memorandum . . . "). The procedural order also provided that Ms. Schott was not required to file a pre-filing memorandum but could do so. *Id.* at 2. On July 10, 2017, the Kindred Defendants filed a pre-filing memorandum, and on July 14, 2017, Ms. Schott elected to do so. *Defs.' Pre-Filing Mem. Pursuant to Local Rule 56(h)* (ECF No. 33); *Pl.'s Rule 56(h) Pre-filing Mem.* (ECF No. 34) (*Pl.'s Mem.*). In Ms. Schott's memorandum, she criticized the Kindred Defendants for making statements unsupported by the record and then listed the "main legal issues arising from these factual disputes." *Pl.'s Mem.* at 3.

Pre-filing conference memoranda were designed to make dispositive motion practice more efficient. The memoranda place the Court and the parties on general notice of the issues likely to be presented, and at the conference itself the parties typically apprise the Court of any matters that could delay the resolution of the motion, such as pending or anticipated *Daubert*[80] motions or lingering discovery issues. The Court usually sets deadlines, expresses preferences regarding summary judgment practice, for example to avoid the quibbling too often present in the presentation of the statements of material fact, and discusses anticipated issues, such as requests for oral argument. Local Rule 56(h) contemplates a generally cooperative and abbreviated process. The Court is unaware of any authority that holds a party strictly to the contents of the pre-filing memorandum and, in fact, the non-movant is not even required to file one, and the Court resists the Kindred Defendants' invitation to make Rule 56(h) into something it was not intended to be.

Moreover, entirely apart from Rule 56(h), once discovery is closed and a dispositive motion filed, either party has the right to bring issues of this sort to the Court and explain why something needs to be done. But that something is rarely, as the Kindred Defendants demand, a default. There are numerous less drastic alternatives than prohibiting a party from asserting a theory of recovery or a defense or the facts supporting that theory. For example, in the appropriate case, if one party truly hoodwinked another and the improper gamesmanship became apparent during

---

[80]     *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).

summary judgment, a court could reopen discovery for a short, narrowly-tailored period and even, if necessary, impose financial sanctions.

At the very least, the offended party should come to the court, lay out the case, provide the discovery that should have elicited a fuller response, allow the other party to attempt to justify her actions, and give the court the facts to fairly evaluate the grievance and arrive at a just solution. Federal Rule of Civil Procedure 56(d) expressly establishes such a procedure for the non-movant, but there is no reason that a similarly-aggrieved movant could not file a similar motion. Here, none of that has been done, and the Court is left with bare accusations by counsel against counsel. The Court declines to enter the fray, and will rule on what is before it. If the Kindred Defendants contend they need to reopen discovery in light of the new information discovered during the dispositive motion process, they have the right to make an appropriate motion.

### B. The Court Considered Ms. Schott's Various Descriptions of Her Call with Dr. Keiski and Communications with Monarch Staff

In her sworn declaration before the MHRC, Ms. Schott stated:

Dr. Keiski was in Yarmouth and had never met resident PD and could not make it to the facility. I told Dr. Keiski that Ms. Tardif went home sick. The "D" family was right next to me when I was on the phone with the doctor. The "D" family gave a direct order for Monarch staff not to give PD the Zyprexa medication. The family was adamant. Dr. Keiski was aware that the family did not want the medication. I relayed Dr. Keiski's and the "D" family's directive to the staff by phone.

Ms. Yesue's report concluded that I violated certain Maine regulations by "administering or discontinuing medication without a written order signed by a duly authorized licensed practitioner." Further, the report alleged that I improperly entered notes on PD's medical administrative record. Ms. Yesue's "proof" that I had made the MAR entry was her

opinion that the handwriting on the MAR entry appeared to be similar to my handwriting. When asked by Ms. Yesue, I denied entering MAR notes by acknowledged that I call Dr. Keiski and relayed her directive and the "D" family directive to the staff.

At no time did I make medical or nursing decisions or decisions to administer or discontinue medications. Dr. Keiski and the "D" family issued the directive to hold Zyprexa and under these emergency circumstances (the "D" family was adamant that PD not receive another dosage of the Zyprexa), it fell to me, as Executive Director, to relay the message regarding this directive to the staff given that there was no clinical person present to do so.

DSMF Attach. 2, *Charge of Discrimination* ¶¶ 13, 17, 18.

Against this MHRA statement, the Kindred Defendants point to Ms. Schott's denial that she had received an order from Dr. Keiski and that she had conveyed Dr. Keiski's order to the staff. *Defs.' Suppl. Br.* at 3. They cite Ms. Schott's statement of material facts paragraphs 32, 33, 34, and 36. *Id.* In these paragraphs, Ms. Schott states that she told Dr. Keiski she was not a nurse and could not take an order, that she did not believe that Dr. Keiski had given her an order, that she believed that Dr. Keiski had acknowledged that the family did not want Zyprexa, that her contact with the staff was to rely the D family's and Dr. Keiski's concerns, and that she relayed the family's and Dr. Keiski's concerns to the staff at the same time she called to have PD transferred to the hospital. PSAMF ¶¶ 32, 33, 36.

### 1. Ms. Schott Has Not Contradicted Herself in Order to Fabricate a Genuine Issue of Material Fact

The Kindred Defendants fail to persuade the Court that it may not consider any record evidence that varies from Ms. Schott's original statement in her MHRC declaration that she "relayed Dr. Keiski's and the 'D' family's directive to the staff by

phone." They claim that by way of her subsequent declarations and testimony, which did not precisely mirror that language, she was impermissibly attempting to fabricate a genuine issue of material fact in order to defeat summary judgment. DRPSAMF ¶ 30. The Court disagrees.

The First Circuit has stated the general rule: "When an interested witness has given clear answers to unambiguous questions, he cannot create a conflict and resist summary judgment with an affidavit that is clearly contradictory, but does not give a satisfactory explanation of why the testimony is changed." *United States v. McNichol*, 829 F.3d 77, 83 (1st Cir. 2016) (quoting *Colantuoni v. Calcagni & Sons*, 44 F.3d 1, 4-5 (1st Cir. 1994)). To meet this rule, both the question and answer must be "clear" and "unambiguous." Here, what Ms. Schott meant when she wrote that she relayed Dr. Keiski's and the D family's directive is simply not, in the Court's view, an unambiguous statement that would be subject to the *McNichol* rule. Moreover, Ms. Schott has presented explanations for her use of the term, "directive," the reasonableness of which must be assessed by a factfinder. The obverse of the *McNichol* rule is also true: namely that "a party may contradict prior sworn testimony provided that a satisfactory explanation is provided." *Driggin v. Am. Sec. Alarm Co.*, 141 F. Supp. 2d 113, 122 n.8 (D. Me. 2000). Here, again viewing contested facts in the light most favorable to Ms. Schott, the Court concludes that Ms. Schott has provided a facially satisfactory explanation for her use of the term, "directive," and subsequent use of different language to describe the same events that is sufficient to present a jury question.

In support of their argument, the Kindred Defendants cite *Blue Star Corp. v. CKF Properties, LLC*, 2009 ME 101, ¶ 31, 980 A.2d 1270.  In *Blue Star*, the Maine Supreme Judicial Court applied the rule "that prevents the introduction of contradictory affidavits solely for the purpose of generating factual issues when none exist."  *Id.*  ¶ 34 (citing *Zip Lube, Inc. v. Coastal Sav. Bank*, 1998 ME 81, ¶ 10, 709 A.2d 733).  The Law Court determined that the appellant-corporation had attempted to do so when its president proposed testimony that his father-in-law was a potential source of redevelopment funds after having first omitted any reference to his father-in-law in responding to earlier "discovery questions posed by [the appellee-corporation] that unambiguously sought disclosure of all individuals and communications relevant to the issue of redevelopment financing."  *Id.* ¶¶ 30-34.  The Law Court cited the First Circuit case of *Hernandez-Loring v. Universidad Metropolitana*, 233 F.3d 49 (1st Cir. 2000), where the First Circuit wrote that "the district court was entitled to disregard any completely new incident that [the plaintiff] described for the first time in her affidavit, assuming that prior questions had clearly asked for such information."  *Hernandez-Loring*, 233 F.3d at 55.  The *Blue Star* Court cited prior applications of the rule to situations including subsequent affidavits that contradicted earlier deposition testimony regarding the sequence of key events, *id.* ¶ 32 (citing Zip *Lube*, 1998 ME 81, ¶ 10, 709 A.2d 733), and to a party's affirmation that her legal expenses were $3,000, contradicting prior sworn testimony that the expenses exceeded $15,000.  *Id.* ¶32 (citing *Schindler v. Nilsen*, 2001 ME 58, ¶ 9, 770 A.2d 638).

Another case the Kindred Defendants cite, *Colantuoni v. Alfred Calcagni &* *Sons, Inc.*, 44 F.3d 1 (1st Cir. 1994), involves application of the same rule. There, the First Circuit stated that "[w]hen an interested witness has given clear answers to unambiguous questions, he cannot create a conflict and resist summary judgment with an affidavit that is clearly contradictory, but does not give a satisfactory explanation of why the testimony is changed." *Id*. at 4-5. The *Colantuoni* Court held that the plaintiff had violated this rule when he stated in an affidavit that he had no knowledge of a ladder's propensity to slip after having stated in his prior deposition testimony that he realized the ladder might slip. *Id*. at 5. The First Circuit cited *Colantuoni* and *Hernandez-Loring* when it applied the same rule in *Escribano-Reyes*, another case the Kindred Defendants cite. There, the First Circuit affirmed the district court's striking of a plaintiff's sworn statements that contradicted his earlier deposition with respect to the number and identities of co-workers who allegedly had made ageist comments, and the year when certain events key to his claims occurred. *Escribano-Reyes*, 817 F.3d at 386-87.

Each of these cases is facially distinguishable from the situation here. In each of them, the statements at issue were clearly contradictory: having identified the father-in-law versus not, having knowledge of a ladder's propensity to slip versus not, having been able to work versus not, saying a key event occurred in one year versus another year. Here, the dispute boils down to comparing the words "directive" and "concerns." Those two terms are not polar opposites. Far from being inherently contradictory, instead they can easily be understood—particularly in the context of

relaying a message from a doctor who did not want a patient to continue to receive doses of a medication—as consistent. Concerns could underlie a directive, and likewise expression of concerns could be understood as a directive. As the Kindred Defendants observe, "[t]he *Zip Lube* rule applies where there is a '*clear*' contradiction, not merely discrepancies, between the prior testimony and the subsequent testimony." *Defs.' Suppl. Br.* at 3 (quoting *Brooks v. Lemieux*, 2017 ME 55, ¶ 16, 157 A.3d 798 (citing *Garland v. Roy*, 2009 ME 86, ¶ 18 n.4, 976 A.2d 940 ("[A]lthough there are discrepancies between [the plaintiff]'s earlier testimony and later testimony, the changes in [his] later testimony do not amount to a direct contradiction of his earlier testimony")) (emphasis in *Brooks*)).

In addition, in her MHRC statement, Ms. Schott used the term, "directive", not "order." The Court disagrees with the Kindred Defendants' contention at oral argument that these terms are one and the same. The term, "order", in the medical field is understood to be a term of art and to have a specific meaning—namely it is a reference to a physician order to start, continue or stop treatment. *See* THE RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE (2d ed, 1987) at 1363 ("order" means "to prescribe: *The doctor ordered rest for the patient*"). Typically, a doctor issues an order, not a directive. A directive strikes the Court as more administrative than medical; something an administrative director, in a position similar to that of Ms. Schott, would issue.

Furthermore, Ms. Schott wrote in her MHRC declaration that the "directive" was "Dr. Keiski's and the 'D' family's." That is, she attributed the information she

was relaying to not only Dr. Keiski, but also the D family. It is possible that she understood the D family's language as a "directive" that Dr. Keiski endorsed during the telephone call, during which the D family was at Ms. Schott's side.

Finally, in her subsequent statements, Ms. Schott clarified what she meant by the term, "directive", and explained that she had intended to mean Dr. Keiski's "concerns," not her order.

Viewing the evidence in the light most favorable to Ms. Schott, the Court finds that Ms. Schott's varying accounts are arguably not contradictory, and to the extent they are contradictory, the Kindred Defendants failed to convince the Court that the subsequent statements were made for the purpose of fabricating a genuine issue of material fact. *See Gillen v. Fallon Ambulance Service, Inc.*, 283 F.3d 11, 26 (1st Cir. 2002) ("A subsequent affidavit that merely explains, or amplifies upon, opaque testimony given in a previous deposition is entitled to consideration in opposition to a motion for summary judgment").

As Ms. Schott acknowledges, she will undoubtedly be subject to cross-examination regarding her call with Dr. Keiski, her communication with the staff regarding Dr. Keiski's words, and her use of language in the MHRC statement and subsequent sworn documents. Even so, this Court may not make its own credibility determinations at this stage in the proceedings. Faced with differing versions, it remains for a jury to resolve whether her statements are in fact contradictory and, if so, whether the contradiction is material.

## 2. Judicial Estoppel Does Not Apply

The United States Supreme Court has instructed that "several factors typically inform the decision whether to apply" judicial estoppel, including "[f]irst, a party's later position must be clearly inconsistent with its earlier position." *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001) (internal quotation and citations omitted). As discussed *supra*, the Court does not find Ms. Schott's various statements to be clearly inconsistent. This is enough for the Court to decline to apply judicial estoppel.

## C. The MHRA and MWPA Claims

"The MHRA provides a right of action to persons who have been subjected to unlawful discrimination, including whistleblowers who have suffered retaliatory discharge or other adverse employment actions." *Costain v. Sunbury Primary Care, P.A.*, 2008 ME 142, ¶ 5, 954 A.2d 1951. There are three elements of unlawful retaliation: (1) the employee engaged in activity protected by the statute, (2) she suffered an adverse employment action, and (3) there was a causal link between the protected activity and the adverse employment action. *Id.*; *Harrison v. Granite Bay Care, Inc.*, 811 F.3d 36, 46 (1st Cir. 2016). "Maine law provides a private right of action for a violation of the [Act]." *Murray v. Kindred Nursing Centers West LLC*, 789 F.3d 20, 25 (1st Cir. 2015) (citing 5 M.R.S.A. § 4572(1)(A), § 4621; *Costain*, 2008 ME 142, ¶ 6, 954 A.2d 1051).

From the Court's perspective, there are factual issues that require resolution to determine whether Ms. Schott's MHRA and MWPA claims are meritorious. The record reflects that Ms. Schott previously placed Kindred management on notice that she had concerns about Ms. Tardif's job performance. As early as the fall of 2014, Ms.

Schott prepared a proposed PIP for Ms. Tardif, but Kindred management refused to allow her to issue it. Instead, in March 2015, Kindred management imposed a PIP on Ms. Schott herself, a PIP that Ms. Schott refused to sign. On March 4, 2015, when Ms. Schott attempted to raise specific concerns about Ms. Tardif, Kindred management told her that they did not want to hear anything about it.

That very weekend, on March 7-8, 2015, having discouraged Ms. Schott from complaining about a Kindred nurse, the Mr. D episode occurred. Whatever else might be said about the events that weekend, the image is of Mr. D medically and mentally decompensating rapidly, even displaying aggressive and violent behavior, and his family becoming increasingly concerned about him, especially about his reaction to Zyprexa. The family and Mr. D were, by Ms. Schott's telling, in desperate need of medical advice and assistance. In fact, Ms. Schott stated that she thought, given the way Mr. D was acting, that his life was in danger. Knowing this, Ms. Tardif, the only on duty nurse, simply left work without speaking to the family or attempting to resolve a quickly deteriorating situation.

Viewing the facts in the light most favorable to Ms. Schott, Ms. Tardif's abandonment of her assigned duties placed the burden on Ms. Schott, as Monarch's executive director, to respond to a situation that Nurse Tardif should have handled. Ms. Schott called Ms. Yesue, her superior, to apprise her of the situation, and Ms. Yesue's response was to fall back on Monarch's licensing requirement and observe that because Monarch was not required to have a nurse on duty at all, she was not concerned about Ms. Tardif leaving. Whatever the technical licensing requirements,

Ms. Yesue's lack of concern ignores a medical professional's overriding obligation not to simply walk away from a patient under her care, who is at risk medically, particularly when there is no alternative available medical coverage.

In an attempt to alleviate a worsening situation, Ms. Schott contacted Dr. Keiski, who knew that Ms. Schott could not receive a medical order. The factual controversy about what happened next will have to be resolved by a factfinder. The Kindred Defendants say that after her conversation with Dr. Keiski, Ms. Schott went to Mr. D's room and entered an order on his medical chart, an act that violated state regulations and justified her dismissal. Ms. Schott denies having received or communicated an order from Dr. Keiski. At oral argument, the Kindred Defendants emphasized the language Ms. Schott used in her sworn MHRC declaration that she "relayed Dr, Keiski's and the 'D' family's directive to the staff by phone." DSMF ¶ 24; PRDSMF ¶ 24. However, as discussed *supra*, the Court declines to limit the evidence to that one characterization because Ms. Schott described the events in different— but not contradictory—terms subsequently.

Ms. Schott also denies having entered a note in Mr. D's chart discontinuing Zyprexa. Even if some signs point to Ms. Schott as the person who entered the Zyprexa order, especially in light of her subsequent conversation with Nurse Courtois, in the face of Ms. Schott's denial, the Court may not view conflicting evidence in the light most favorable to the Kindred Defendants. It is possible that one of Mr. D's family members entered the order or that another member of the Monarch staff, though not licensed to do so, entered the order. In any event, in ruling

on the motion for summary judgment, the Court must view this important factual dispute in a light most favorable to Ms. Schott and assume that she did not enter the order, because she says she did not.

With that predicate, the Kindred Defendants must have terminated Ms. Schott for something she did not do. This fact, again viewed in a light most favorable to Ms. Schott, must be combined with the Kindred investigation, leading to Ms. Schott's dismissal. The Kindred Defendants assigned the primary duty to investigate the incident to Ms. Yesue, the person who had an incentive to justify her own failure to act when Ms. Schott informed her about Nurse Tardif's absence and the lack of clinical coverage for a critical medical situation.[81] Furthermore, in performing her investigation of Ms. Schott, Ms. Yesue only interviewed Ms. Schott and examined Nurse Courtois' note and Mr. D's medical chart. Ms. Yesue did not interview Dr. Keiski, Nurse Tardif, Mr. D's family members, or any other members of Monarch's staff.

In their briefing, the Kindred Defendants make much of the fact that Ms. Schott had the option to call 911 and have Mr. D transported to a local hospital. But a close reading of Ms. Schott's version of the events substantiates that she says she did just that, and at oral argument the Kindred Defendants acknowledged as much. Although the parties have not been precise about all the exact times, Ms. Schott presents the following sequence: (1) at the March 9, 2015 morning meeting, Ms.

---

[81] The statements of material fact refer to Gregg Hanscom's involvement in the investigation, but the facts presented by the parties focus only on Ms. Yesue's investigation. It is unclear what role Mr. Hanscom actually undertook other than participating in the termination meeting of March 12, 2015.

Schott and others, including Nurse Tardif, discuss Mr. D's worsening situation, (2) Nurse Tardif reports that she is ill and is leaving for home, (3) Ms. Schott attempts to convince her to stay and meet with Mr. D's family, (4) Nurse Tardif refuses and leaves Monarch at 10:44 a.m., (5) Ms. Schott visits Mr. D's room at 11:00 a.m.,[82] speaks with Mr. D's son, and realizes the gravity of Mr. D's condition, (6) Ms. Schott leaves a message for Dr. Keiski, (7) Ms. Schott speaks with Ms. Yesue, (8) Dr. Keiski returns Ms. Schott's call; (9) Ms. Schott relays the family's and Dr. Keiski's concerns to the staff at the same time she calls to have Mr. D transferred to the hospital, PSAMF ¶ 38; DRPSAMF ¶ 38, and (10) the ambulance transports Mr. D to the hospital at 2:00 p.m.[83]  Under her version of the events, Ms. Schott did in fact call 911 for an ambulance at the same time she notified the staff of Dr. Keiski's and the D family's concerns.

With these facts, Ms. Schott has accumulated enough evidence to withstand summary judgment on her MHRA and MWPA claims.  By her prior complaints about Nurse Tardif and her complaint on March 9, 2015 to Ms. Yesue, Ms. Schott placed the Kindred Defendants on notice that Ms. Schott had "reasonable cause to believe"

---

[82]    The Court fixed 11:00 a.m. for Ms. Schott's visit to Mr. D's room and conversation with Mr. D's son from the following agreed upon statements of material fact: Around 2 p.m., three hours after Mr. D's son began speaking with Ms. Schott about his concerns, Mr. D was transferred to the Maine Medical Center.  DSMF ¶ 26; PRDSMF ¶ 26; PSAMF ¶ 22; DRPSAMF ¶ 22; PSAMF ¶ 40; DRPSAMF ¶ 40.

[83]    As an aside, it is ironic that if Ms. Schott entered the discontinue order in Mr. D's MAR, it had no practical effect.  This is because under Dr. Keiski's order, even though his dosage was "prn", Mr. D was scheduled to receive his next dose of Zyprexa at 8:00 p.m. and he was transferred to the hospital at 2:00 p.m. PSAMF ¶ 41; DRPSAMF ¶ 41.  At the same time, as a prn order, as the Court understands the term, Mr. D could have received a dose of Zyprexa as needed and the order discontinuing Zyprexa would have countermanded the prn order.  More importantly, even if the unauthorized order had no practical effect, the integrity of the medical chart would have been compromised when someone other than an authorized clinician entered a medication order in his MAR.

that there was "a condition or practice that would put at risk the health or safety of . . . any other individual." 26 M.R.S. § 833(1)(B).  Under the MHRA, an employer "may not discriminate against any individual because that individual has opposed any act or practice that is unlawful under this Act." 5 M.R.S. § 4633(1).  Interpreting Maine law, the First Circuit has written that retaliation against an employee's report to an employer "to stop a dangerous condition" may be sufficient to state a retaliation under the MHRA and MWPA.  *Harrison*, 811 F.3d at 51 (quoting *Cormier*, 2015 ME 161, ¶ 11, 129 A.3d 944).

Critical to the analysis is the employee's motivation.  *Id.* at 50 ("[U]nder *Winslow* - - properly understood - - the employee's <u>motivation</u> in making the report is critical") (emphasis in *Harrison*) (referring to *Winslow v. Aroostook Cnty*, 736 F.3d 23 (1st Cir. 2013)).  Here, Ms. Schott has stated that her prior complaints about Nurse Tardif were based on her concern about the health and safety of Monarch nursing home residents and that her call to Ms. Yesue on March 9, 2015 was based on her concern that Mr. D could die.

Applying the shifting burdens analysis of *McDonnell Douglas*[84], the Court readily concludes that Ms. Schott has made out a prima facie case and it equally readily concludes that the Kindred Defendants have articulated a legitimate, non-retaliatory reason for taking the adverse action against her.  Again viewing the evidence in a light most favorable to Ms. Schott, the Court also concludes that she has presented sufficient evidence for a reasonable factfinder to conclude that the

---

[84]     *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)

Kindred Defendants' stated reasons for termination were pretextual and the real reason was that she repeatedly complained about safety and health conditions at Monarch.

### D.    Defamation

Under Maine law, there are four elements for a defamation claim: (1) a false and defamatory statement concerning another, (2) an unprivileged publication to a third party, (3) fault amounting to at least negligence on the part of the publisher, and (4) either actionability of the statement irrespective of special harm or the existence of special harm caused by publication. *Lester v. Powers*, 596 A.2d 65, 69 (Me. 1991); *see* Jack H. Simmons, Donald N. Zillman & Robert H. Furbish, Maine Tort Law § 13.04 (2018 ed.).  The Kindred Defendants do not argue in this motion that Mr. Newman's statements were privileged, non-negligent, or not actionable without special harm.[85]

Ms. Schott's defamation claim is directed against Mr. Newman's statements to Eleni Kowash and Edie Rossborough on April 7, 2014.  Specifically, Ms. Schott points to Mr. Newman's representations that (1) she chose to act in a clinical manner when she was not licensed to do so, (2) that there were other options available to her and

---

[85]    On this last issue, under Maine law, "a plaintiff need not prove special damages to recover general damages for slander when the falsely spoken words impugn his profession, occupation or official status." *Gautschi v. Maisel*, 565 A.2d 1009, 1011 (Me. 1989).  Although Ms. Schott is not a nurse, Mr. Newman's comments effectively accuse her of trying to act like one; at least two defamation cases in Maine have arisen in a medical context. *Saunders v. Van Pelt*, 497 A.2d 1121 (Me. 1985) (defamation of a psychologist); *Farrell v. Kramer*, 159 Me. 387, 390, 193 A.2d 560, 562 (1963) (concluding that a remark that discredited a nurse's competence may be taken as slander per se).  Alternatively, Mr. Newman impugned Ms. Schott's honesty and ability to perform her chosen occupation, that of executive director of a nursing home.

there was a clinician in the building who could have handled the situation, (3) that she was not forced to do so because of an emergency and that the "walls were [not] going to fall down," (4) that he had conducted the investigation "personally" into her behavior, and (5) that her unlicensed actions had "forced his hand" and he had to fire her.

If Ms. Schott in fact wrote Dr. Keiski's order on Mr. D's chart, the defamation claim rests on a shaky foundation. However, Ms. Schott denies doing so, and therefore, for purposes of the motion for summary judgment, the Court must credit her version of the events. The Kindred Defendants stress in their filings that in Ms. Schott's sworn charge to the MHRC, she wrote that "Dr. Keiski and the 'D' family issued the directive to hold the Zyprexa and under these emergency circumstances (the 'D' family was adamant that PD not receive another dosage of the Zyprexa), it fell to me, as Executive Director, to relay the message regarding this directive to the staff given that there was no clinical person present to do so." *Defs.' Mot.* at 16 (citing DSMF ¶ 24).

There is a critical difference, however, between what Ms. Schott wrote in her statement to the MHRC and what Ms. Yesue concluded in her investigation leading to Ms. Schott's termination. Ms. Schott wrote to the MHRC that she phoned the staff to let them know that Dr. Keiski and the family did not want Mr. D to receive any more Zyprexa. Viewed in a light most favorable to Ms. Schott, as discussed *supra*, she was not conveying a clinical order to the staff. In fact, the staff would presumably know that they are required to follow only doctor's orders regarding medication

communicated by a registered nurse or pharmacist and that those orders must appear in the chart. Here, again viewed in a light most favorable to her, Ms. Schott was merely placing the staff on notice that a formal order discontinuing the medication was forthcoming so that when it came time to administer the medication, the staff would be aware of potential issues with the medication and double check to determine whether to administer Zyprexa.

Ms. Yesue concluded something different. She found that Ms. Schott had not merely let the staff know about Dr. Keiski's and the family's concerns, but that she had actually gone to Mr. D's medical chart and had written out a note that discontinued Zyprexa for Mr. D. Ms. Yesue compared the writing and the blue ink on Mr. D's medical chart to Ms. Schott's writing and the type of ink on Ms. Schott's other memoranda. As a consequence, the March 12, 2015 PIP stated:

> Acting outside the scope of practice, as evidenced by: accepting <u>and transcribing</u> a physician's telephone order on to resident P.D.'s MAR (Medical Administration Record). Denying that she wrote on MAR "hold until further notice."

*Stip.* ¶ 12 (emphasis supplied); *see also* PSAMF ¶ 52; DRPSAMF ¶ 52. According to the statements of material fact, the PIP concluded that Ms. Schott "improperly entered notes on Mr. D's MAR." PSAMF ¶ 52; DRPSAMF ¶ 52. Ms. Schott has never admitted that she entered orders on Mr. D's medical chart.

With this background, the Court turns to what Mr. Newman told Ms. Kowash and Ms. Rossborough. Again viewing the facts in a light most favorable to Ms. Schott, Mr. Newman told them that she had acted clinically, when she did not. In effect, Mr. Newman told these concerned women that Ms. Schott had been playing doctor or

nurse and she took it upon herself do something only a licensed health care professional could do.  This may have happened, but the Court is prohibited at this stage from finding that it did.

Once this critical piece is in place, Mr. Newman's other alleged misrepresentations tend to confirm that he defamed Ms. Schott.  His statement that there was a clinician in the building at the time of the incident appears to be false, even by the Kindred Defendants' view of the facts, and this statement tended to paint Ms. Schott as a rogue employee, who deliberated flouted Maine regulation.  To the extent that his statement that there were other alternatives available to Ms. Schott including a call to 911, Ms. Schott has said that she did call 911 right after speaking with Dr. Keiski, so the implication that Ms. Schott ignored this alternative in favor of entering the medication order is false, when viewed from Ms. Schott's perspective. His statement that he personally participated in the investigation when he did not conveyed to Ms. Kowash and Ms. Rossborough that the investigation was more thorough and fair than it was.  His statement that there was no emergency suggests that Ms. Schott took these actions without just cause and purposefully without reason.  His statement that Ms. Schott's actions "forced his hand" suggested that the Kindred Defendants were extremely reluctant to fire Ms. Schott and did so only because her actions were so egregious that termination was mandatory, when the facts viewed in a light most favorable to Ms. Schott suggest that they were anxious to fire her.

At bottom, if the allegation that Ms. Schott acted clinically is false, she has stated a defamation claim that survives summary judgment.

## VI.    CONCLUSION

The Court DENIES Defendants' Motion for Summary Judgment (ECF No. 38).

SO ORDERED.

<u>/s/ John A. Woodcock, Jr.</u>
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 27th day of July, 2018